IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) No. 4:16 CR 83 HEA/NCC |
| | ) |
| MICHAEL MCDONALD | ) |
| | ) |
|     Defendant. | ) |

**POST HEARING BRIEF IN SUPPORT OF PRETRIAL MOTION TO SUPPRESS EVIDENCE**

    Defendant MICHAEL MCDONALD, through his attorney, Robert C. Wolfrum, Assistant Federal Public Defender, states the following in support of his Motion to Suppress Physical Evidence. Docs. # 47, 56, & 62.  Mr. McDonald hereby incorporates by reference and does not waive any of the allegations of fact or legal arguments included in his previously filed Motion.  In further support Mr. McDonald states the following:

### *Introduction:*

    1.   On February 1, 2017, counsel for Mr. McDonald filed a Motion to Suppress Physical Evidence and Statements.  Doc. # 47.  This Motion was supplemented on July 5, 2017 and on July 20, 2017.  Doc. # 56 & 62.

    2.   On July 27, 2017, the Court conducted a hearing on the Motion; testimony was heard and exhibits were presented.

    3.   Mr. McDonald's Motion seeks to suppress evidence seized from his residence, specifically: (1) a DELL *Desktop* Inspiron 530 Computer, Service Tag Number 3X7XhG1 and its contents, (2) a DELL *Laptop* Computer Model no. PP31L, CN-OP792H486439430946 A00 and its contents, (3) a Dell *Phone* Model No: B88DUO, M_IMEI: 863733012155372 and its contents, and (4) a *camera* and its contents.

1

These items were seized in violation of the Fourth Amendment which makes searches and seizures inside a home presumptively unreasonable.

4.      Based on the evidence adduced before this Court on July 27, 2017, the seizure of the items from Mr. McDonald's home on March 29, 2016, violated both his right to protection against unreasonable searches and seizures under the Fourth Amendment of the United States Constitution and his rights under the law and Constitution of the Philippines.

5.      The government's evidence failed to establish that the items seized from Mr. McDonald's home in the Philippines, that it seeks to introduce at trial, are untainted by their unlawful seizure and therefore admissible.  *United States v. Phillips,* 540 F.2d 319, 325 – 26 (8th Cir. 1976) (When an illegal search has come to light, the government has the ultimate burden of persuasion to show that its evidence is untainted).  Therefore, (1) a DELL *Desktop* Inspiron 530 Computer, Service Tag Number 3X7XhG1 and its contents, (2) a DELL *Laptop* Computer Model no. PP31L, CN-OP792H486439430946 A00 and its contents, (3) a Dell *Phone* Model No: B88DUO, M_IMEI: 863733012155372 and its contents, and (4) a *camera* and its contents should be suppressed.

6.      Because the items in question were seized illegally, any evidence discovered in subsequent electronic searches of them was acquired by exploitation of the illegality and tangible or testimonial evidence concerning these items should be excluded from any trial of this case or consideration at sentencing.

### *Facts*

7.      In August 2015, a Sergeant with the St. Louis County Police Department assigned as a Task Force Officer with the FBI to investigate the exploitation of children, participated in an authorized online undercover operation.  Government's Hearing Exhibit ("Gov't Ex.") #5 at 2 – 3.  The Sergeant began communicating with an email account connected to Mr. McDonald with an address in Huntington

Beach, California.  However, the Sergeant later learned that Mr. McDonald was living in the Philippines.  *Id.*

8.      The investigation resulted in the FBI securing sufficient images and evidence in the United States to support an Indictment of Mr. McDonald in February, 2016.  Doc. #2.[1]  The Indictment specifically references photographic or computer generated images created by or stored in a computer and transmitted over computer communications networks via the internet.  *Id.*

9.      Following the Indictment, FBI Special Agent Nikki Badolato had discussions with the FBI's  Legal Attache Office ("LEGAT") in Manila, Philippines about the process of revoking Mr. McDonald's United States passport and executing his arrest in that country.  Transcript of Evidentiary Hearing July 27, 2017 ("Tr.") at 38.  At that time there was no Philippines investigation of Mr. McDonald.  Tr. at 95. Even if there had been a local investigation, there was evidence that U.S. government officials believed that "[t]he local legal system and criminal justice system in his community are fraught with delays and other obstacles, therefore they are not viable alternatives to stopping McDonald's predatory behavior." Defendant's Hearing Exhibit ("Def. Ex.") #1 at 3; Tr. at 100 - 101.  Furthermore, the U.S. law enforcement agents had no law enforcement authority in the Philippines to execute the arrest.  Tr. at 43.  Therefore, it was determined by U.S. authorities they would need to coordinate with the Philippine government authorities to bring Mr. McDonald back to the United States for prosecution which would "[involve] getting the Philippine government to arrest and deport him."  Tr. at 49.  By revoking his passport, U.S. authorities could ask the Philippines government officials to arrest and then expel Mr. McDonald from their country on behalf of U.S. law enforcement officials - which the Filipino authorities agreed to do.  Tr. at 64 – 65 & 85.

---

[1] All references to the Court file of this case will be made by "Doc." followed by the docket number in Cause No. 4:16CR83 HEA.

10.     In order to accomplish the goal of getting Mr. McDonald arrested for the United States law enforcement authorities, first his passport was revoked.  Tr. at 36.

11.     Second, Special FBI Agent Tenzin Atsatsang received help from the Philippines government to find him.  Tr. at 62 – 63.  The FBI provided Philippines law enforcement officials with information (ostensibly including a copy of the official Indictment against Mr. McDonald which had been given to Agent Atsatsang).  Tr. at 83 & 91.  Philippines law enforcement officials gave the FBI information, conducted spot checks, and took surveillance photographs of where Mr. McDonald lived. Tr. at 39, 63, & 83.  The FBI officials and Philippines law enforcement officials had phone conversations and met in person with Philippines law enforcement officials to document what they observed.  Tr. at 92.  Agent Atsatsang communicated with Melody Gonzales from the Philippines Bureau of Immigration and Jonathan Balite from the Philippines National Bureau of Investigation.  *Id.* United States law enforcement officials "working with the government in the Philippines" were able to find Mr. McDonald living in Davao City on the island of Mindanao.  ("Gov't Ex.") #5 at 4 ¶ 12; Tr. at 62 & 84.

12.     After he was located, Mr. McDonald's arrest "was being coordinated there in the Philippines between [U.S.] representatives and the Philippines government."  Tr. at 40.

13.     On March 29, 2016, at 6:30 in the morning, Mr. McDonald was outside his house in Davao City, Philippines, putting children's backpacks in a car.  Tr. at 198 – 199.  Approximately 12 to 15 people arrived at the house where he was living.  *Id.* Many of them were Filipino Immigration officials.  Tr. at 200.  Mr. McDonald testified that he thought one of them was a gentleman from the U.S. Consulate.  Tr. at 201.  Atsatsang and another United States agent named Gordon traveled to the area of McDonald's home in a van at the time of the arrest and seizure of evidence.  Tr. At 69, 70, and 86.  Atsatsang entered McDonald's home at one point.  Tr. At 87.

4

14.     Mr. McDonald was informed he was under arrest.  Tr. at 199.  He was told that his wife was packing a suitcase with his clothes which he appreciated since he did not know if he would ever be returning to the Philippines.  Tr. at 201 & 209.  He was accompanied back inside the house to secure a small gift bag with some underwear, socks, medication and a hairbrush.  Tr. at 200 & 202.   He then went outside with his wife.  Tr. at 201.  Before he left the area, a big man who looked Filipino came from inside his house and rolled a suitcase out of his house.  Tr. at 203.  The Philippines officials told Mr. McDonald that the suitcase contained his clothes and he did not object to his clothes being seized by the Philippines government officials.  Tr. at 209.  Mr. McDonald was never been in possession of the suitcase on March 29, 2016, has not had possession of it since then, and never had an opportunity to see what was in it when it was taken from his home.  Tr. at 203.[2]

15.     About an hour after his arrest, Mr. McDonald was at the Philippines Department of Justice Bureau of Immigration where he was detained while awaiting removal to the United States. While there he was informed that contrary to what he was told when he was arrested, with the exception of a couple of T-shirts, shorts, underpants and socks, his wife had allegedly packed for him, the suitcase taken from his home also contained two computers and a camera that were seized from his house.  Gov't Ex. 3.

16.     The next day Agent Atsatsang was notified by State Department personnel that Mr. McDonald's "belongings were taken" from his home when he was arrested.  Tr. at 88.  No search warrant was secured from the Philippines court system nor did a Philippines court proceeding authorize the seizure of the computers and camera.  Tr. at 95 – 96, 103.

---

[2] In an earlier filing, the Government characterized the items of physical evidence at issue here as "items that [McDonald] brought with him from the Philippines."  Doc. # 50 at 8.  However, the hearing evidence clearly established that this is not an accurate description of what really happened.

17.     Furthermore, since none of the U.S. officials were present for Mr. McDonald's arrest and they did not see the seizure of the computers and camera from his house, law enforcement officials from the U.S. profess they have no knowledge of why the camera and computers were seized, who seized them, or how they came to be in the possession of Philippine Immigration authorities. Tr. at 41, 43 – 45, 56, 72, 91.

18.     On April 1, 2016, Special Agent Secker of the FBI met Mr. McDonald at the airport in Manila to escort him to the United States for his initial appearance in federal court on the charge contained in the Indictment.  At that time Mr. McDonald was in the custody of Philippine authorities and the suitcase that had been seized from his home was already checked in (e.g. would not be a carry-on for the flight).  Tr. at 137 – 138, 157.

19.     During the flight home with Special Agent Secker, Mr. McDonald who had been informed by the Philippine Immigration authorities that two computers and a camera had been seized from his home and placed in the suitcase (Govt.'s Exhibit 3), mentioned to the Agent that those items might be in his suitcase.  Tr. at 151 & 160.  Of course, never having been in possession of the suitcase, and not knowing what his wife packed and what may have been put in the suitcase by the Filipino law enforcement authorities,  Mr. McDonald could not be sure.   However, when Agent Secker asked, Mr. McDonald did not give his consent for the agent or U.S. law enforcement authorities to search the suitcase.  Tr. at 164 & 166.

### The Seizure of Mr. McDonald's Suitcase Was a Violation of the Constitution and Law of the United States and the Constitution and Law of the Philippines

_United States Constitution and Law_:

20.     The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. Constitution, Amendment IV.   Evidence procured with the participation of government

actors implicates the Fourth Amendment. *Lustig v. United States*, 338 U.S. 74 (1949).

21.     The Supreme Court in *Chimel v. California,* held that a search of an individual incident to

arrest is permissible, and further that arresting officers may search the area within the arrestee's

immediate control, to protect the safety of the officers, and to prevent the destruction of evidence.

*Chimel v. California,* 395 U.S. 752, 762-763 (1969).  However, due to the high degree of protection

afforded residences (because an individual has a higher expectation of privacy in a residence, as

compared to an automobile) once a person is in custody, a search of their house is "unreasonable" under

the Fourth Amendment.  *Id.* at 768.  *See also United States v. Martinez-Fuerte,* 428 U.S. 543, 561

(1976) ("[O]ne's expectation of privacy in an automobile and of freedom in its operation are

significantly different from the traditional expectation of privacy and freedom in one's

residence…[which is] ordinarily afforded the most stringent Fourth Amendment protection").

22.     In *Arizona v. Gant,* the Supreme Court allowed that when a search incident to arrest

involves a vehicle, police are authorized to search both the arrestee for contraband or weapons, as well

as the vehicle if the arrestee is unsecured and within reaching distance of the passenger compartment at

the time of the search.  *Arizona v. Gant,* 129 S. Ct. 1710, 1719 (2009).  *Gant* went even further to

conclude that "circumstances unique to the vehicle context justify a search incident to a lawful arrest

when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."

*Id.* (quotation omitted).  However, this exception does not extend to residential searches.  *See e.g. United

States v. Taylor,* 656 Fed. Supp. 2d 998, 1003 (E.D. MO 2009).  In *Taylor,* the defendant was arrested,

removed from his home, and secured in a police car based on an outstanding warrant for Unlawful Use

of a Weapon and Tampering with a Witness.  *Id.* at 1000.  The police re-entered the home to search the

immediate area where he was found to conduct a secondary sweep of the area for contraband and

7

weapons and located a weapon which resulted in the federal charge of felon in possession of a firearm. *Id.* at 1001.  Taylor's Motion to Suppress the weapon was sustained because the Court found that the exception allowing an officer to search for evidence of the offense incident to arrest does not apply to residences when the defendant is secured and removed from the residence. *Id.* at 1003.

23.     Exigent circumstances may provide an exception to the limitations of the Fourth Amendment when it comes to searching and seizing evidence from houses.  Police are not required to delay their efforts to investigate if to do so would gravely endanger their lives or the lives of others, a suspect's escape is imminent, or evidence is about to be destroyed.  *Michigan v. Tyles,* 436 U.S. 499, 509 (1978); *United States v. Ramirez,* 676 F.3d 755, 759 (8th Cir. 2012) (citation omitted).  The government bears a heavy burden to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries.  *Welsh v. Wisconsin,* 466 U.S. 740, 750 (1984).  When the exigency is concern over the destruction of evidence, the government must demonstrate a sufficient basis to believe that somebody in the residence will imminently destroy the evidence.  *United States v. Clement,* 854 F.2d 1116, 1119 (8th Cir. 1988).

24.     In *Schneckloth v. Bustamonte,* the Supreme Court affirmed the principle that the search and seizure of property without a warrant and without probable cause but with proper consent voluntarily given is reasonable under the Fourth Amendment.  *Schneckloth v. Bustamonte,* 412 U.S. 218, 220 – 223 (1973).  A third party (other than a defendant-"owner") who has mutual use of certain property and joint access or control for most purposes may provide consent to seize property.  *United States v. Matlock,* 415 U.S. 164, 172 (1974); *see also United States v. Clutter,* 674 F.3d 980, 983 - 985 (8th Cir. 2012) (Father of an incarcerated defendant, who was in actual possession of the computers in his home, had authority to consent to their seizure).  Furthermore, even when a third party lacks actual authority to consent to a seizure of property, the Fourth Amendment's reasonableness requirement is not

violated if the officers reasonably relied on the third party's apparent authority to consent. *Id.* at 983 (citation omitted). However, when a prosecutor seeks to rely upon consent to justify the lawfulness of a search and seizure, he or she has the burden of proving that the consent was in fact freely and voluntarily given. *Schneckloth v. Bustamonte,* at 222.

25.     The government has provided no evidence that this Court may rely on to conclude that the seizure of the computers and camera from Mr. McDonald's home in the Philippines was reasonable under the Fourth Amendment. The evidence is that Mr. McDonald was arrested outside his house on March 29, 2016, at 6:30 in the morning, based on the revocation of his United States Passport and an Indictment that was pending against him in the Eastern District of Missouri. Tr. at 67 – 68 & 199. There was at least one van full of officers from the Davao National Bureau of Investigation and Davao Bureau of Immigration and possibly one person from the United States Consulate present to accomplish Mr. McDonald's arrest. Tr. at 68 L. 20 – 25 & 199 & 201. The un-contradicted evidence before the Court is that after his arrest, a big man who looked Filipino, likely one of the many officers who came in the first van, came from inside the house rolling a suitcase. Tr. at 203. Once Mr. McDonald was arrested outside of his home, surrounded and secured by all of the officers present, the search of his home and seizure of the items in the suitcase was "unreasonable" under the Fourth Amendment because it was not a valid search incident to his arrest. *Chimel v. California,* 395 U.S. 752, 762-763 (1969).

26.     The United States agent who was invited to be present for the arrest was in a van some 100 yards or feet from Mr. McDonald's home and testified that he could not see the arrest or the seizure of the property. Tr. at 72, L. 1- 13; at 73, L. 23 – 24; at 74, L. 3 – 10. He was accompanied by a second United States agent named Gordon. Tr. At 86, L. 2-9. None of the U.S. officials who testified before the Court could provide any basis upon which the Court may determine why the camera and computers were seized, who seized them, or how they came to be in the possession of Philippine Immigration

9

authorities. Tr. at 41, 43 – 45, 56, 72, 91.  Therefore, the government presented no evidence that any of the exceptions to the Fourth Amendment's prohibition against unreasonable seizures from a person's home apply.

27.    The government does not allege that there were exigent circumstances to justify the seizure. When he was permitted to re-enter his home to retrieve his medication and some personal items Mr. McDonald was accompanied by a law enforcement officer and he had no ability to destroy or secrete the computers or the camera.  Tr. at 200 & 202.  The evidence supports the conclusion that caseworkers from the Department of Philippines Department of Social Welfare and Development were present when Mr. McDonald was arrested to "rescue" any minors who may have been in danger inside the house – and FBI Special Agent Atsatsang went into the house and was able to determine that no one was in immediate danger after Mr. McDonald was arrested.  Tr. at 69 – 70, 74 – 75, 86.  The government has not even suggested that anyone in the home was trying to destroy the computers or the camera either when the Philippines officials were there or when the FBI Special Agent arrived. Therefore, the government has not met its "heavy burden" to establish for this Court that exigent circumstances were present to justify the unreasonable seizure of evidence in this case.  *Welsh v. Wisconsin,* 466 U.S. 740, 750 (1984).

28.    The government does not allege that either Mr. McDonald or any third party consented to the seizure of the computers and the camera.  The evidence is un-contradicted that statements were made to Mr. McDonald that his wife had packed *his clothes* in the suitcase that was taken from his home. Tr. at 201 – 2019.   There is no evidence that she voluntarily consented to the removal of the computers and camera or that she placed those items in the suitcase herself.   Mr. McDonald did not voluntarily consent to the seizure of the computers and camera because he was never in possession of the suitcase and was not aware that those items were in it.  Tr. at 203.  By the time he was told what had been seized from his

house – it was too late – they were already in the custody of the Philippines Immigration authorities. Gov't Ex. 3.  When given an opportunity to grant consent to even open the suitcase he declined.  Tr. at 164 & 166.  The government has provided no evidence for this Court to conclude that any consent was freely and voluntarily given to remove the computers and camera from Mr. McDonald's home to justify the unreasonable seizure of evidence in this case. *Schneckloth v. Bustamonte,* at 222.

29.     Therefore, the seizure of Mr. McDonald's Suitcase was an unreasonable seizure that violated his rights under the Fourth Amendment of the United States Constitution and laws.

*Philippines Constitution and Law:*

30.     The right against unreasonable searches and seizures is secured by Section 2, Article III of the Philippines Constitution which states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures of whatever nature and for any purpose shall be inviolable, and no search warrant or warrant of arrest shall issue except upon probable cause to be determined personally by the judge after examination under oath or affirmation of the complainant and the witnesses he may produce, and particularly describing the place to be searched and the persons or things to be seized.

As a general rule, the procurement of a warrant is required before a law officer can validly search or seize the person, house, papers or effects of any individual.  *People v. Sevilla,* 394 Phil. 125, 139 (2000).

31.     Article III, Section 3(2) of the Philippines Constitution also states: "any evidence obtained in violation of this or the preceding section shall be inadmissible in evidence for any purpose in any proceeding."

32.      There are a number of exceptions to the search warrant requirement under Philippines law and they include (1)  A search incident to arrest (2) Seizure of evidence in "plain view" (3) Search of vehicles under certain circumstances (4) Consented to searches and seizures (5) Customs searches and seizures (6) Stop and Frisk (7) Exigent and emergency circumstances (8) Searches of vessels and aircraft and (9) Inspections of buildings and other premises for the enforcement of fire, sanitary, and building

11

regulations.  *Sr. Insp. Jerry C. Valeroso v. Court of Appeals and People of the Philippines,* G.R. No. 164815 at 4 (S.C., Sept. 3, 2009) (Phil.).

33.      Searches incident to lawful arrests under Philippines law are limited to the seizure of evidence or dangerous weapons either on the person of the one arrested or within the area of his immediate control.  *Id.* at 5; *People v. Estella,* 443 Phil. 669, 685 (2003).  In *Sr. Insp. Jerry C. Valeroso,* the defendant was arrested lawfully by virtue of a warrant for kidnapping.  *Id.*  At the time of his arrest he was sleeping inside a boarding house and after he was awakened, physically restrained, and removed from the room in the custody of one officer, other officers searched the room and located a firearm and ammunition in a cabinet.  *Id.*  When the search of the cabinet took place, the defendant was not in the room and therefore the weapon and ammunition were not within the area of his immediate control, leading the court to conclude that the items were not seized legally incident to his arrest and is therefore inadmissible.  *Id.*  The government presented no evidence upon which the Court can conclude that Mr. McDonald's computers and camera were within the area of his immediate control when he was arrested outside the house and they were located inside.

34.      The "plain view" doctrine is applied where a police officer is not searching for evidence against an accused, but nonetheless inadvertently comes across an incriminating object. *People v. Cubcubin, Jr.,* 413 Phil. 249, 271 (2001).  However, it must be immediately apparent that the item is "evidence" and this doctrine does not support the seizure of items based on a general exploratory search from one object to another until something incriminating at last emerges.   *Id.* at 272.  The government has provided no evidence that this Court may rely on to conclude that the computers and camera seized from Mr. McDonald's home in the Philippines were apparently incriminating "evidence" as there was no way to know that anything illegal was contained in these computers without looking inside of them.

36.     The government has provided no evidence for this Court to conclude that any consent was freely and voluntarily given to remove the computers and camera from Mr. McDonald's home that would comply with the law of the Philippines.  The law of the Philippines regarding third party consent is comparable to that of the United States.  *See Philippine Law on Search and Seizure: A Restatement,* Dr. Antonio R. Bautista, Philippine Criminal Procedure, at 221.[3]  Furthermore, the seizure is not legally valid under the Philippines' "customs search" exception because the power of customs authorities to search a passenger coming from or going abroad, ceases after he has debarked and has been permitted to leave the port.  *Id.* at 225.

37.     The government has provided no evidence for this Court to conclude that exigent circumstances were present to justify the unreasonable seizure of evidence in this case.  *See People v. de Gracia,* 233 SCRA 716 (1994) (Where there is no time or opportunity to apply for and secure a search warrant or where an accused is attempting to flee or hide his identity while holding contraband the need for a search warrant can lawfully be dispensed with).  There was sufficient time for the Philippine authorities to secure a search warrant to seize the computers and camera as there was no indication that anyone in the home was trying to destroy the computers or the camera either when the Philippines officials were there or when the FBI Special Agent arrived.  Furthermore, Mr. McDonald did nothing to suggest that he would defy any Philippine court order regarding his case.

38.     Therefore, the seizure of Mr. McDonald's Suitcase was an unreasonable seizure that violated his rights under the Constitution and laws of the Philippines.

---

[3] Located at: http://plj.upd.edu.ph/wp-content/uploads/plj/PLJ

### *Any Evidence From Any Computer or Camera Seized From Mr. McDonald's Home in the Philippines on March 29, 2016 Must Be Suppressed Because it was the Product of an Illegal Search*

39.     The Fourth Amendment's exclusionary rule does not apply to the acts of foreign officials, in a foreign country, when dealing with American citizens.  *United States v. Barona,* 56 F.3d 1087, 1091 (9th Cir. 1995).  The Fourth Amendment's exclusionary rule was intended to protect the people of the United States against arbitrary action by their own government and not foreign governments.  *United States v. Verdugo-Urquidez,* 494 U.S. 259 (1990).  This principle has been called the international "silver platter" doctrine because regardless of the vagaries of foreign law enforcement practices, as long as the investigative venture and search are the product of foreign officials acting alone, the results can be served up on a "silver platter" for use by the United States in a criminal prosecution.  *See* Wayne R. LaFave & David C. Baum, *Foreign police and the international "silver platter,"* Search and Seizure: A Treatise on the Fourth Amendment § 1.8(h) (5th ed.) (Oct. 2016).

40.     There are recognized exceptions to this doctrine, however, that take into account the reality that law enforcement across international boundaries may involve the actions of United States agents who remain bound by the United States Constitution when dealing with American citizens.  The Eighth Circuit has not directly addressed the application of these exceptions but they are well developed in other Federal Circuits and should guide the Court in navigating the legal issues in the present case.  *See United States v. Stokes,* 726 F.3d 880, 890 – 91 (7th Cir. 2013) (collecting cases).

41.     The first exception to the bar against enforcing the Fourth Amendment's exclusionary rule in cases involving foreign officials, in a foreign country, dealing with American citizens, applies if the circumstances of the foreign search are so extreme that they shock the judicial conscience.   The un-contradicted evidence presented to this Court was that the authorities who seized the computers and camera from Mr. McDonald's home in the Philippines lied to him about it and told him that his wife had

14

packed only his clothes in the suitcase removed from his home.  In light of this act of deception in securing evidence against him, the Court may find that this exception applies in this case and exclude the evidence.

42.     The second exception generally requires the involvement of United States authorities in the seizure such as when the investigation was a "joint venture" carried out by both foreign and U.S. law enforcement.  *See e.g. United States v. Barona,* 56 F.3d 1087, 1091 (9th Cir. 1995); *United States v. Peterson,* 812 F.2d 486, 488 – 92 (9th Cir. 1987); *Lau v. United States,* 778 F.Supp. 98, 100-101 (D.P.R. 1991).   Some courts will only apply this exception if the foreign officials were acting as "virtual agents" for their U.S. counterparts, or where the cooperation between the U.S. and foreign law enforcement agencies is "designed to evade constitutional requirements" applicable to American officials.  *See United States v. Getto,* 729 F.3d 221, 227 – 233 (2nd Cir. 2013).  The question of whether there was a "joint venture" or foreign officials were acting as "virtual agents" or the foreign search was "designed to evade" U.S. constitutional requirements is one of fact to be decided by the Court and not by the witnesses, investigators, or the prosecutor.  *United States v. Barona,* at 1090.

43.     Under the second exception, if the Court finds sufficient involvement of United States authorities in the seizure, the Court must then determine if the search was "reasonable" under the Fourth Amendment to the Constitution.[4]  There are three factors that have been considered in determining the reasonableness of a seizure of evidence from an American citizen in a foreign country involving United States and foreign authorities: (1) did the seizure comply with the law of the foreign country? (2) did American agents act on a reasonable belief that the foreign seizure complied with the foreign country's law? (*United States v. Peterson,* at 491), and (3) did the government's need for the evidence outweigh

---

[4] Though the Supreme Court has not addressed the issue, an extraterritorial search may not have to meet the warrant requirement - - only the more general reasonableness requirement of the Fourth Amendment.  *See United States v. Stokes,* at 890-894; *United States v. Getto,* at 228;  *In re Terrorist Bombings,* 552 F.3d 157, 167, 171 – 174 (2nd Cir. 2008).

the citizen's privacy interests under the totality of the circumstances?  *United States v. Stokes,* at 893.

Other relevant factors courts have considered include whether there is evidence that authorities had a

warrant from the foreign country where the accused was residing and whether the accused was

physically present for the search and seizure.  *Id.*

*Joint Venture:*

44.     The evidence available to this Court establishes that the arrest of Mr. McDonald and the

seizure of the two computers and a camera from his home on March 29, 2016, in Davao, Philippines

have all the elements of a "joint venture" between United States and Filipino government officials.

45.     A "joint venture" exists when United States agents are involved in assisting the foreign

authorities or vice versa.  *See e.g. United States v. Stokes,* at 886 – 891 (A "joint venture" existed in part

because U.S. Immigration authorities sought help from the Thai Police who agreed to help investigate

the defendant by conducting surveillance); *United States v. Barona,* at 1090 (Where Danish authorities

secured wiretaps of defendants and DEA agents provided interpreters to translate recordings a "joint

venture" existed); *United States v. Peterson,* at 490 (After DEA notified Philippine authorities,

Philippine Narcotics Command conducted surveillance on drug traffickers; later, DEA assisted with

translation and decoding of wiretaps – "joint venture" found); *United States v. Hensel,* 699 F.2d 18, 25

(1st Cir. 1983) (In a "close case" in which the appellate court finds evidence both for and against the

existence of "joint venture" but decides case on other grounds, evidence that U.S. asked Canadians to

seize a ship for them if it came into Canadian waters – which was done – is one of the factors that would

support a finding that a "joint venture" existed); *Lau v. United States,* at 100 ("Joint venture" found

based in part on the fact that DEA requested assistance from St. Martin Attorney General in a drug

investigation).

16

46.     In the present case, the United States government's plan (which it successfully carried out) was to revoke Mr. McDonald's passport and ask Philippines government officials to arrest and expel him from the country back into U.S. custody for federal prosecution.  Tr. at 64 – 65 & 85.  Philippine law enforcement officials first assisted the FBI by conducting spot checks, taking surveillance photographs, and supplying information regarding where Mr. McDonald lived.  Tr. at 39, 63, & 83.  The FBI and Philippine law enforcement officials had phone conversations and met in person with each other to document what they had observed.  Tr. at 92.  Later, their joint efforts culminated in Mr. McDonald's arrest by Philippine authorities which had been "coordinated there in the Philippines between [U.S.] representatives and the Philippines government."  Tr. at 40.  The presence of the United States law enforcement officers during an arrest and search should be considered as some evidence of the joint operation. Tr. at 68 – 69 & 200.

47.     A "joint venture" exists when United States agents are assisted by foreign authorities regarding a U.S. crime.  *See e.g. United States v. Peterson,* at 490 (The marijuana being trafficked was destined for the United States where the defendant was to be prosecuted); *United States v. Hensel,* 699 F.2d 18, 25 (1ˢᵗ Cir. 1983) (One of the factors that *did not* support a finding that a "joint venture" existed was the fact that Canada also intended to prosecute the defendants for Canadian crimes as a result of the investigation); *Lau v. United States,* at 100 ("Joint venture" found based in part on the fact that the sole purpose of the search and seizure was to get evidence to be used in a U.S. federal prosecution).

48.  In this case there was no Philippines investigation of Mr. McDonald and no indication that that country had any interest in or plan to prosecute him for any crime.  Tr. at 95.

49.  A plain indication that an investigation is a "joint venture" is how it is described by the parties involved.  For example, in *United States v. Peterson,* the DEA agents called their activities in the Philippines a "joint investigation" which the Court found relevant to conclude that one existed.

17

*Peterson* at 490. In Mr. McDonald's case, despite the agents' protestations that the United States government could not "tell the Philippine government what to do…" and that they "did not have control over their activities," they were in fact "working with the government in the Philippines." Gov't Ex. #5 at 4 ¶ 12. Furthermore, Mr. McDonald arrest "was being coordinated there in the Philippines between [U.S.] representatives and the Philippines government." Tr. at 40. There is therefore an ample basis to conclude that the operation designed by the U.S. government to secure Mr. McDonald's arrest and return to the U.S. for prosecution, was a "joint venture" between the United States and the Philippines authorities.

*Virtual Agents/ Evading Constitutional Requirements:*

50.     The Filipino officials, who had no pending investigation of Mr. McDonald and expressed no interest in prosecuting him based on the evidence before this Court, were acting as "virtual agents" for United States law enforcement in its quest to secure his detention and removal to the U.S. for prosecution. The issue is not whether the United States was able to order the Filipino authorities to engage in certain actions, the issue is whether American officials played "some role" in controlling "or directing" the conduct of the foreign investigation. The law does not require that the role or direction be involuntary – of course the Philippines authorities could have refused to assist the U.S. authorities – their choice to voluntarily work at the behest of the United States agents does not make their actions any less at the "direction" of those agents. All that is required is that "American officials…*play some role* in controlling or directing the conduct of the foreign investigation." *United States v. Getto,* 729 F.3d 221, 230 (2nd Cir. 2013) (emphasis added) *citing United States v. Cotroni,* 527 F.2d 708, 712 (2nd Cir. 1975) (declining to suppress the fruits of foreign wiretaps where the United States government did not in any way *initiate*, supervise control, or direct the wiretapping). In the present case, the arrest of Mr. McDonald would not have occurred but for the United States initiation of charges against him and

revocation of his passport.  Tr. at 36.  The FBI provided Philippines law enforcement officials with information (ostensibly including a copy of the official Indictment against Mr. McDonald which had been given to Agent Atsatsang).  Tr. at 83 & 91.

51.  Finally, the concern that American law enforcement should play some role in the actions of the foreign authorities before a United States judge may apply U.S. Constitutional rules to those actions reflects a concern with inculcating respect on the part of U.S. authorities for the U.S. Constitution. When the United States government operates in a foreign country in a manner that is designed to evade their own constitutional requirements, they may not then take advantage of the beneficial outcomes that result – e.g. the seizure of evidence they find helpful.    *See Getto*  at 230 (United States constitutional restrictions attach where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials).   In the present case, the U.S. authorities chose to remain wholly ignorant of the manner in which Philippine authorities carried out the arrest for them; although Special Agent Atsatsang was invited to witness the arrest, he remained at a location where he could not do so.  Tr. at 72 & 74.  FBI Special Agent Nikki Badolato "is not aware" of any efforts made by Philippine officials to get a search warrant.  Tr. at 42 & 91.  In fact, during almost an entire month between the time both governments discovered where Mr. McDonald lived and the day of his arrest (Tr. at 91), the government presented no evidence that a U.S. agent asked the Philippines agents to pursue any legal authority to search for or seize evidence.  Instead, the U.S. agents persisted in their belief, unsupported by any evidence at the hearing before this Court, that "[t]he local legal system and criminal justice system in his community are fraught with delays and other obstacles…" Def. Ex. #1 at 3; Tr. at 100 - 101.

52.    The United States authorities chose to put their collective heads in the sand and avoid any inquiry regarding whether the conduct the Philippine officials intended to carry out was compliant with

19

Filipino law that would require a warrant for the seizure of the computers and camera.  Knowing that the case against Mr. McDonald involved computers, FBI Special Agent Atsatsang who had had discussions with the Philippine officials regarding the nature of Mr. McDonald's charges (Tr. at 91 – 92), knew before the Philippine officials arrested Mr. McDonald that there had been no effort to secure a search warrant and he intentionally did not ask if one would be necessary for the evidence they seized or if the arrest was legal under Philippines law. Tr. at 96.  *Compare Peterson,* at 491 (It was reasonable for DEA agents to rely on "foreign law enforcement officers' representations that there has been compliance with their own law" and based on this good faith exception, the Fourth Amendment exclusionary rule would not apply).

*The Seizure of the Computers and Camera was Unreasonable Under the Fourth Amendment:*

53.     Since there is significant evidence in this case that the arrest of Mr. McDonald and seizure of his computers and camera were the result of a "joint venture" by the United States and Philippines law enforcement officials the Court must then determine if the search was "reasonable" under the Fourth Amendment to the Constitution.

54.     The evidence in this case does not support that the seizure was reasonable or compliant with Fourth Amendment requirements.  First, the seizure of the computers did not comply with either United States law or the law of the Philippines.  *See* ¶¶ 19 – 38 *supra.*

55.     Second, the American agents conducted no due diligence to determine if the planned actions of the Philippine authorities, acting on their behalf to take Mr. McDonald into custody because his passport was revoked by the United States and transfer him to U.S. custody for return to the United States for prosecution, were legal under Philippine law.  They also had no reasonable belief that the foreign seizure complied with the foreign country's law.  *See United States v. Peterson,* at 491.   56.

56.     Third, Special Agent Atsatsang insisted that U.S. authorities "did not want [the Philippine

officials] to seize any items from Mr. McDonald's house.  Tr. at 76.[5]  Certainly, there was at least some evidence in the possession of the U.S. government officials that could be used in the prosecution of this case that had permitted them to secure an Indictment against Mr. McDonald.  Therefore, the government's need for the computers and the camera cannot be said to outweigh Mr. McDonald's privacy interest in his property.  *See United States v. Stokes,* at 893.

57.    Finally, it is significant that the un-contradicted evidence is that Mr. McDonald was actively deceived by law enforcement officers regarding what they brought out of his house.  He was told his wife was packing clothes.  He was not present when the computers and camera were taken and he was not aware they were seized until he was in the custody of Philippine Immigration later that day. The deception about what was actually in that suitcase is evidence that the seizure was unreasonable. *United States v. Stokes,* at 893.

58.    It is not unfair to characterize the Philippine law enforcement agents in this case as acting in part as agents of the United States and helping to evade constitutional requirements applicable to American officials.  The length of time that United States and Philippine officials both knew the location of McDonald would have allowed at least an attempt at judicial authorization of a search at the defendant's home.  To some extent, the manner in which the Philippine investigation was conducted was controlled by the United States to the extent that there was a complete lack of any effort to involve the Philippine judicial system because of perceived delays or corruption.  Unlike in *Peterson*, there was never any assurance from Philippine officials that lawful authorization was being obtained.  American law enforcement agents were present or in close proximity at the time of the arrest and seizure of property.  They were informed of the seizure from the residence.  They appear from the evidence to have shadowed McDonald until he was taken from the country in United States custody.  What possible

_____

[5] The insistence on the part of Special Agent Atsatsang remains suspect in light of the government's resolve in pursuing the use of the evidence that is the basis for this Motion.

motive did Philippine or other law enforcement officials have to tell the defendant that his clothes were being packed in a suitcase to accompany him if not to secure evidence for an American prosecution?  He was being expelled from the country.  They had no prosecution of their own in progress.  Philippine law enforcement delivered or handed off the fruit of the search to American law enforcement officers so that it could be taken to the United States.  As the Court in *Peterson* put it, "In all of the circumstances here, we are unable to conclude that the DEA's role was subordinate to the role of Philippine authorities." *Peterson*, at 490.

*Fruit of the Poisenous Tree:*

59.     The Supreme Court has explained that the overriding issue in fruit of the poisonous tree cases "is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  *Wong Sun v. United States,* 371 U.S. 471, 488 (1963) (internal quotation marks omitted).  The exclusionary rule bars the admission of physical evidence and witness testimony obtained directly or indirectly through the exploitation of police illegality.

60.     The illegal and unreasonable seizure of the computers and camera was not attenuated by the FBI's need to "identify" or "inventory" the suitcase that arrived in the United States when Mr. McDonald arrived.  In *Wong Sun,* law enforcement officers entered a man's residence without a warrant in violation of the Fourth Amendment.  *Id.* at 474.  Once inside, the owner of the residence made an incriminating statement to police that he knew someone who sold narcotics.  *Id.*  Acting on the statement, the police went to the home of the second man and discovered drugs. *Id.*  The Supreme held that the warrantless entry into the first home was an illegal search and the discovery of information while there leading to the drugs in the second home was the direct result of the illegal search, and not the result of "an intervening independent act of free will" on the part of the defendant.  *Id* at 486.  Likewise,

in Mr. McDonald's case, nothing that was done with the suitcase and items therein involved his free will.  When given even a minimal opportunity to exercise any intervening consent to search or seize the items he specifically refused.  Tr. at 164 & 166.

BY REASON OF THE FOREGOING, this Court should enter an order granting defendant's motion to suppress physical evidence seized from his home.

Respectfully submitted,

/s/Robert C. Wolfrum
ROBERT C. WOLFRUM
Assistant Federal Public Defender
1010 Market Street, Suite 200
St. Louis, Missouri 63101
Telephone: (314) 241-1255
Fax: (314) 421-3177
E-mail: Robert_Wolfrum@fd.org

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2017, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Rob Livergood, Assistant United States Attorney.

/s/Robert C. Wolfrum
ROBERT C. WOLFRUM
Assistant Federal Public Defender