UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16 CR 83 HEA (NCC) |
| | ) | |
| MICHAEL BRUCE MCDONALD, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S POST-HEARING BRIEF

COMES NOW, the United States of America, by and through Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Robert F. Livergood, Assistant United States Attorney for said District, and states as follows:

### I.   INTRODUCTION

The defendant has been indicted on one count of transportation of child pornography. On February 1, 2017, defendant filed his motion to suppress evidence. First, defendant moved to suppress the electronic evidence seized from his suitcase claiming that the search was warrantless and that no exceptions to the search warrant exception applied. Second, defendant moved to suppress his statements claiming that his statements were involuntary made. Third, defendant moved to dismiss the Indictment arguing that the term "lascivious" was unconstitutionally vague.

An Evidentiary Hearing was conducted on July 27, 2017, at which time witnesses were called and evidence adduced. When the hearing concluded, the Court requested that the parties submit post-hearing briefs. On September 18, 2017, defendant filed his post-hearing brief to

1

which the Government is now responding.

The Government relies upon its previous filings and incorporates them herein by reference.

## II.     FACTS

The evidentiary hearing established the following:

Defendant was indicted in *United States v. McDonald*, on February 24, 2016. Special Agent Nikki Badolato testified at the evidentiary hearing that defendant was living in the Philippines at the time of the Indictment. Evidentiary Hearing Transcript ("Tr."), at pp.8-9. At the time, SA Tenzin Atsatsang was an FBI agent stationed in the Philippines. Tr., at p.59. He had no law enforcement authority in the Philippines. Tr., at p.59. His job was to manage the Child Sex Tourism program out of Manila. Tr., at p.57. His "primary function was to be a liaison with the Philippine federal law enforcement officials in furtherance of FBI investigations." Tr., at pp.57-58. His job was to pass information between the United States and the Philippine governments. He was not able to instruct the Philippine officials what to do. Tr., at p.58. He could not make the Philippine officials act on any of the information he passed along. Tr. at p.59. SA Atsatsang could not control the Philippine officials' activities. Tr., at pp.59-60.

The Philippine government officials that SA Atsatsang was dealing with did not act at his direction nor did he have control over their activities. Tr., at p.60. He could not make the officials do anything on his behalf. Tr., at p.60.

SA Atsatsang learned that defendant was in Davao. Tr., at p.61. Davao was located on a different island than Manila. A terrorist group called "Abu Sayaf" operated on the island. There was fear that the group would kidnap foreigners, especially Americans. Tr., at pp.61-62.

2

SA Atsatsang was not permitted to go to Davao without special permission from the State Department. Tr., at p.62.

SA Atsatsang submitted a request to the Philippine government officials seeking assistance in locating defendant. Tr., at p.63. Although officials did not have to assist, they agreed to assist in locating defendant. Nothing of value was given to the officials and the officials were not working at the direction of SA Atsatsang. Tr., at p.63.

As a result of the Indictment in this case, defendant's U.S. passport was revoked by the State Department. Tr., at p.64. The Philippine government was notified that defendant's passport was revoked. Tr., at p.64. The Philippine government was going to deport defendant because his passport was revoked. Tr., at pp.65-66. It was up to the Philippine government what action to take. Tr., at p.85. The United States government was not going to be part of defendant's arrest. Tr., at p.43.

There was no discussion among United States officials about seizing any computers from defendant's residence in Davao. Tr., at p.91; *see also* tr., at p.41. No one tried to circumvent the laws of the United States nor the laws of the Philippines. Tr., at pp.50-52.

SA Atsatsang sought permission to travel to Davao. Tr., at p.66. He flew from Manila to Davao around March 28, 2016. Tr., at p.67. On March 29, 2016, three vehicles went to defendant's residence in Davao on a Philippine government operation. Tr., at p.71. The first vehicle contained officials from the Davao National Bureau of Investigation (NBI) and Davao Bureau of Immigration (BI). Tr., at p.68. The second vehicle had officers from NBI that were going to be involved in the rescue of the minor victims. The third vehicle contained SA Atsatsang, Assistant Legal Attaché (ALAT) Alexander Gordon, NIB officials, and children

3

division workers. Tr., at pp.69-70, 86. This was a Philippine government operation; the FBI was present only to observe. Tr., at p.71. The Philippine government officials decided when the operation was going to take place. Tr., at p.71. No one told the officials how to conduct their operation. Tr., at p.73.

When the vans pulled up to defendant's residence, the van containing the U.S. law enforcement officers did not go onto defendant's property. Tr., at p.72. Nor was SA Atsatsang able to view defendant's property because his view was blocked by the other vans. Tr., at p.72. No U.S. Government official directed the Philippine government officials on what to do.1 Tr., at p.72. Nor was there a mechanism to direct them, because there was no method of communication between the vans. Tr., at p.72. By the time SA Atsatsang arrived at defendant's property, the first van already left along with defendant. *See* tr., at p.74. SA Atsatsang stepped inside defendant's residence for about 20 or 30 seconds. He saw one of the victims and some Philippine government agents. He did not direct anyone what to do and did not direct anyone to seize anything. Tr., at pp.75-76. Nor did he see anyone seize any computers or other devices from defendant's residence. Tr., at p.100. It was about a day later that SA Atsatsang became aware that defendant had personal belongings with him when he left the residence. Tr., at p.88.

When defendant was taken by the Philippine officials, he did know whether he would be returning to his residence. Tr., at pp.208-9. When defendant asked where his wife was, he was told that she was packing his suitcase. Tr., at p.209. Defendant did not object, but responded, "Thank you." Tr., at p.209. Defendant's wife packed his belongings. *See* tr., at pp.45, 53, 151,

---

1 Although defendant claims that someone from the Consulate was present, defendant never spoke with him other than to say "hi" when the person introduced himself.

166, 202, 209, 211; *see also* Gov. Ex. 5 at ¶ 15. Defendant approved of her packing his suitcase. Tr., at p.211. A man rolled the suitcase out of defendant's house, but defendant did not know who the man was. Tr., at p.203. Defendant thought the man was Filipino.

SA Atsatsang was not aware that defendant's possessions went with defendant until a day or so later. Tr., at p. 88. After defendant was taken from the residence, SA Atsatsang saw defendant briefly in another room at the BI office in Davao. Tr., at p.77. The next time SA Atsatsang saw defendant was on April 1, 2016, in Manila. Tr., at p.79. By that time, defendant went through the Philippine government's legal system and was being deported. Tr., at p.102.

According to Government's Exhibit 3, defendant purportedly signed an inventory on March 29, 2016, at 7:15 a.m., acknowledging that the following items were his personal belongings:

1. Two (2) T-shirts, Two (2) Short pants, underwear, socks;
2. One (1) Unit Kodak Easy Share Digital Camera;
3. One (1) Unit Dell CPU with Service Tag 3X7XHG1 and Express Service Code 8539050385;
4. One (1) Unit Dell Laptop Model Number PP31L.

Gov. Ex. 3.

On either March 28, or March 29, 2016, SA Todd Secker and SA Cindy Dockery flew to Manila, Philippines. Tr., pp.134-35. On April 1, 2016, the agents met defendant at the airport in Manila. Tr., at p.136. Defendant was in the custody of the Philippine officials. Defendant was in fine condition and did not appear to have any issues. Tr., at p.136. The LEGAT officials from the FBI were present, including SA Atsatsang. Tr., at p.137. Defendant had a carry-on bag with him,

5

and had a suitcase. Tr., at pp.137-38. Defendant boarded with his carry-on bag and the suitcase was checked into the airplane. Tr., at p.138.

Defendant and Special Agents Secker and Dockery boarded and sat in the rear of the plane. There was nothing separating the defendant and agents from the rest of the passengers. Tr., at p.142. He was not handcuffed during the flight. Tr., at p.138. The agents did not have weapons on them. Defendant was tired and took a short nap after take-off. Tr., at p.142. At about 8:15 a.m. (Central Time), defendant ate when the food was served. Tr., at pp.142, 144. He slept, and asked for a blanket when he awoke. Tr. at p.143.

At about 9:30 a.m. SA Secker advised defendant of his *Miranda* rights with the assistance of the "Advice of Rights" form. Tr., at p.144; Gov. Ex. 10. Defendant, a former police officer, acknowledged, by signing the form, that he understood his rights and was willing to talk to the agents without a lawyer present. Tr., at pp.145-46. The agents then questioned defendant. He was not threatened nor were any promises made to him. Tr. at p.147. At no time did the agents try to overbear defendant's will or try to break him down. Tr. at pp.147, 156. During the questioning, defendant did not invoke his rights. Tr. at p.147. His demeanor was cordial during the course of the interview. Tr., at p.152. During the interview on the plane, defendant was lucid and able to talk logically. Tr., at p.156.

There was one question, however, that defendant did not answer at first: whether or not he had physical sexual contact with minor girls. Tr., at p.149. Later during the interview, however, defendant volunteered the answer. Tr., at p.151. Defendant also said during the interview that his wife packed his luggage. Tr., at pp.151, 166. Defendant mentioned that

6

electronics could be in his luggage. Tr., at p.151. SA Secker asked defendant for permission to search his property, and defendant declined. Tr., at p.164.

Defendant was the one who brought up the computers when be asked about photographing the victims. Tr., at pp.165-66.

Defendant took another nap and woke up around 4:47 p.m. He was mentally alert. Tr., at p.152. Around 5:00 p.m., SA Secker again advised defendant of his *Miranda* rights. Tr., at p.152. Defendant signed another advice of rights form. Tr., at pp.152-53; Gov. Ex. 11. Defendant ate and was given the opportunity to use the restroom. Tr., at p.154.

The plane landed in Los Angeles. Defendant and the agents were one of the first to leave the plane. SA Randall Devine and other officers met defendant at the gate. Tr., at pp.155, 107.

SA Devine identified himself to defendant. He told defendant that he was going to take him from the airport and he would be taken for an initial appearance. Tr., at p.108. SA Devine was not aware that anyone else would be present to meet the defendant at the airport, such as friends or family members. Tr., at p.109. SA Devine took custody of defendant and Special Agents Secker and Dockery left. Tr., at p.110.

Defendant went through the immigration process. Tr., at p.111. Defendant's luggage arrived at the airport carousel with the other passengers' luggage. Tr., at p.111. Defendant identified the luggage on the carousel. Tr., at p.112. SA Devine took custody of defendant's luggage because there was nothing else they could do with it. Tr., at p.113. They picked up the luggage and it went to the immigration area. Tr., at pp.111, 123. SA Devine opened the bag so that he could be certain that it was defendant's luggage. Tr., at pp.112-13. SA Devine did not

7

recall whether he asked defendant for permission to open the suitcase. Tr., at p.127. However, defendant was present and did not object. Tr., at p.114.

The reason SA Randall opened the suitcase and asked defendant if the contents were his, was for the purpose of identifying the bags. Tr., at p.131. Defendant was not surprised when he viewed the contents of the luggage. Tr., at p.114. The contents were inventoried and memorialized on a "United States Department of Justice, Federal Bureau of Investigation, Receipt for Property Received, Returned, Release and Seized" form, also known as an FD-597. Tr., at p.115; *see also* Gov. Ex. 2. The purpose of the inventory search is to ensure safekeeping of the property. Tr., at p.130; *see also* tr., at p.130. It is the FBI's policy. *See* tr., at pp.10-13; *see also* Gov. Ex. 1.[2]

One of the items inventoried was the Bureau of Immigrations Inventory form. Tr., at p.118. After going through customs, the luggage was booked into evidence because it was the best way to manage it. Tr., at p.113.

After going through Customs, defendant repeatedly tried to talk to SA Randall about his case. Tr., at p.119. SA Randall advised the defendant not to talk about his case. Tr., at p.119. Nevertheless, defendant told SA Randall that he really screwed up. Tr., at p.119. Defendant was lucid and coherent. Tr. at p.120. He never claimed that anyone mistreated him. He was clear, pleasant, and cooperative. Tr., at pp.120-21. Defendant was taken to the Metropolitan Detention Center. Tr., at p.121. Defendant's belongings were taken to the Field Office, secured, and booked into the Evidence Control facility. Tr., at pp.121-22.

---

2 SA Badolato testified about the FBI's inventory policy. *See* tr. at pp. 9-10; Gov. Ex. 1. According to the policy, when an agent arrests someone who has possession of personal property, that property must be inventoried, including any closed containers. Tr. at pp.11-12.

8

Defendant's personal items were transferred from the FBI in Los Angeles to the FBI in St. Louis. Tr., pp.27-29; *see also* Gov. Ex. 4. Defendant's personal items were received by the St. Louis FBI office on May 5, 2106. Tr., at p.29. SA Badolato sought and obtained a federal search warrant to search defendant's Dell Desktop computer, Dell Laptop computer, and a "myphone" Cell phone. Tr., at pp.30, 31, *see also* Gov. Exs. 5 and 6.

Det. Michael Slaughter of the St. Louis County Police Department is a forensic examiner. Tr., at p.175. Det. Slaughter checked the items out of evidence on May 17, 2016, so that he could forensically examine the items pursuant to the search warrant. After he was finished "imaging" the computer hard drive, he returned it on June 13, 2016. Tr., at pp.177, 182. Det. Slaughter reexamined the "image" in May of 2017 under the authority given in the search warrant. Tr., at pp.183, 186.

### III. LEGAL ANALYSIS

As stated above, in addition to the following, the Government is relying on, and incorporates by reference, its previously filed responses to defendant's motions.

A. *Discussion of United States v. Williams.*

Defendant argued that *United States v. Williams*, 553 U.S. 285 (2008), explicitly found that the term "lascivious" was unconstitutionally vague. *See* (Doc. #46, at 1). *Williams* did not find the term "lascivious" to be unconstitutionally vague. *Williams*, instead, dealt with "the question whether [18 U.S.C. § 2252A(a)(3)(B)] is overbroad under the First Amendment or impermissibly vague under the Due Process Clause of the Fifth Amendment." *Williams*, 553 U.S. at 288. Section 2252A(a)(3)(B) involves the criminalization of pandering and soliciting of child pornography. The Court found that § 2252A(a)(3)(B) was not overbroad under the First

9

Amendment and was not impermissibly vague under the Due Process Clause of the Fifth Amendment. *Williams*, 553 U.S. at 299, 306-7.

Section 2252A(a)(3)(B), provides:

Any person who—
(3) knowingly—
   (B) advertises, promotes, presents, distributes, or solicits through the mails, or in interstate or foreign commerce by any means, including computer, any purported material in a manner that reflects the belief, or that is intended to cause another to believe, that the material or purported material is, or contains—
       (i) an obscene visual depictions of a minor engaging in sexually explicit conduct; or
       (ii) a visual depiction of an actual minor engaging in sexually explicit conduct. . . .

*Williams*, 553 U.S. at 289-90.[3] The term "sexually explicit conduct" included, among others, the "lascivious exhibition of the genitals or pubic area of any person." *Id.* at 290 (citing 18 U.S.C. § 2256(2)(A)(v)).

"Generally speaking, § 2252A(a)(3)(B) prohibits offers to provide and requests to obtain child pornography. The statute does not require the actual existence of child pornography." *Williams*, 553U.S. at 293. The Eleventh Circuit noted that the crime could be committed without a person ever having child pornography. In that regard, it discussed the term "lascivious." The court of appeals wrote:

> Because lascivious is not defined under the PROTECT Act, we apply its ordinary meaning of "exciting sexual desires; salacious." What exactly constitutes a forbidden "lascivious exhibition of the genitals or pubic area" and how that differs from an innocuous photograph of a named child (e.g. a family photograph of a child taking a bath, or an artistic masterpiece portraying a naked child model) is not concrete. Generally,

---

3 The statute has since been modified to include the broader jurisdictional hook of "or using any means or facility of interstate or foreign commerce."

10

>courts must determine this with respect to the actual depictions themselves. While the pictures needn't always be 'dirty' or even nude depictions to qualify, screening materials through the eyes of a neutral factfinder limits the potential universe of objectionable images.

*United States v. Williams*, 444 F.3d 1286, 1299 (11th Cir. 2006) (citations and footnotes omitted), rev'd by 553 U.S. 285. The court of appeals was concerned that "the law does not seek to attach liability to the materials, but to the ideas and images communicated to the viewer by those materials." *Id.*

The Supreme Court rejected the Eleventh Circuit's analysis. In discussing the court of appeal's discussion of "lascivious," the Supreme Court observed:

> . . . the Eleventh Circuit also thought that the statute could apply to someone who subjectively believes that an innocuous picture of a child is "lascivious." . . .That is not so. The defendant must believe that the picture contains certain material, and that material in fact (and not merely in his estimation) must meet the statutory definition. Where the material at issue is a harmless picture of a child in a bathtub and the defendant, knowing that material, erroneously believes that it constitutes a "lascivious exhibition of the genitals," the statute has no application.

553 U.S. at 301. The Supreme Court did not find the term "lascivious" as unconstitutionally vague.

Also, in reviewing the statute for vagueness arises out of the Due Process Clause of the Fifth Amendment, the Supreme Court wrote, "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." 553 U.S. at 304. The Supreme Court had no problem determining that the statute was not void for vagueness. 553 U.S. at 306.

Thus, the Supreme Court did not rule that the term "lascivious" was unconstitutional, but

found that the statute that relied upon the term was constitutional both under the First Amendment and the Fifth's Amendment Due Process Clause.

B.    *Discussion Concerning Defendant's Suitcase brought from the Philippines*

On March 29, 2016, Philippine officials went to arrest defendant for being out of status in their country. Tr., at p.67. Defendant was out of status because his United States Passport had been revoked. Defendant was deported from the Philippines and was flown to Los Angeles, California. Defendant's carry-on bag and his suitcase accompanied him. At issues is defendant's suitcase that contained clothing, a digital camera, and computers. Defendant appears to be conceding that he gave permission for his clothing to accompany him, but claims that he did not give permission for his camera and computers to accompany him, which requires their suppression. In responding, the Government supplements its previously file brief. *See* "Government's Response in Opposition to Defendant's Supplement to Motion to Suppress and Argument Concerning Motion to Suppress," (Doc. #60).

"Generally, the Fourth Amendment and the exclusionary rule have no application to the acts of foreign law enforcement officials on foreign soil, even if the subject of the foreign search is an American citizen." *United States v. Omar*, 2012 WL 2277821, * 1 (D.Minn. Jun. 18, 2012), citing *United States v. Maturo*, 982 F.2d 57, 60 (2d Cir. 1992).

Assuming that a foreign government illegally seized evidence, that evidence is not subject to the exclusionary rule unless:

1.    the conduct of the foreign officials in acquiring the evidence is so extreme that it shocks the judicial conscious; and

2.    where foreign officials were cooperating with U.S. officials such that

12

      a.      the foreign officials were agents of the U.S. law enforcement officials; or

      b.      the purpose of the cooperation was designed to evade constitutional requirements applicable to the U.S. law enforcement officials.

*See United States v. Getto*, 729 F.3d 221 (2d Cir. 2013); *see also* (Doc. #60), at pp. 2-4.

    1.    *No Government entity illegally seized defendant's luggage.*

Here, defendant's luggage was not illegally seized. Defendant brought a carry-on-bag with him to the United States and a suitcase. *See* tr., at pp.137-38, 202. Regarding the suitcase, all of the evidence adduced during the evidentiary hearing was that defendant's wife packed his bags incidental to his arrest. The defendant knew his wife packed his bags and approved of it. There is no evidence that anyone assisted defendant's wife in packing the suitcase; there is no evidence that anyone told defendant's wife what to put in the suitcase; and there is no evidence that anyone other than defendant's wife put anything in the suitcase. It is uncontroverted that defendant's wife packed defendant's belongings in the suitcase because he was being deported. Thus, the evidence adduced at the hearing is devoid of any government entity seizing defendant's belongings.

Defendant argues that Philippine officials lied to him when they told defendant that his wife packed clothing in the suitcase. Apparently, defendant is arguing that his wife only packed clothing, nothing else. As stated above, there is no evidence supporting defendant's claim. The only evidence is that defendant's wife packed his bags, no one else.

    2.    *Rolling the Suitcase out of Defendant's Residence.*

Assuming, for arguments sake, that the Philippine officials seized defendant's suitcase by rolling the suitcase out of defendant's residence, it should still not be suppressed under *Getto*.

First, it cannot be said that the Philippine officials were agents of the U.S. law enforcement officers in rolling out the suitcase. There were no plans made to take any of defendant's personal items and the U.S. law enforcement officers were not present when the suitcase was being rolled out. Thus, the Philippine official was not acting as an agent of the U.S. law enforcement officers.

Second, assuming that it was illegal for the Philippine official to roll the suitcase out of the residence, mere illegality under foreign law does not shock the conscience. *See Getto*, 729 F.3d at 228. It is not enough that the Philippine officials failed to obtain a search warrant. *See id.* at 229. The violation must shock the conscience. "[G]overnment conduct that shocks the conscience generally involves '[e]xtreme physical coercion' that cause brutal injuries 'offensive to human dignity.' *United States v. Chin*, 934 F.2d 393, 398-99 (2d Cir. 1991). . . ." *United States v. Umeh*, 646 Fed.Appx. 96, 100 (2d Cir. 2016) (unpublished). There is absolutely no evidence that defendant was mishandled in any way, nor has he alleged he was mishandled. Thus, the conduct in rolling out the suitcase does not shock the conscious and the suitcase and its contents should not be suppressed.

Taking it one-step further, even if Philippine government officials seized the electronics and placed them in defendant's suitcase, such conduct would not rise to the level of "egregious." Mere illegality under foreign law does not shock the conscience. *See Getto*, 729 F.3d at 228. It is not enough that the Philippine officials failed to obtain a search warrant. *See id.* at 229.

Thus, the evidence should not be suppressed.

3.      *The Philippine officials were not agents of the United States.*

As stated above, the Philippine officials were not agents of the United States law enforcement officers. To be an agent, "American officials must play some role in controlling or

14

directing the conduct of the foreign parallel investigation." *Getto*, 729 F.3d at 230. "Although the Eighth Circuit has not yet addressed this issue, . . . where the facts demonstrate that the United States made a request to a foreign government for information or that the foreign government conduct surveillance of a particular person, that fact alone will not support a finding of a joint venture. Instead, there must be facts which show a more substantial involvement by United States officials in the foreign investigation and/or surveillance." *Omar*, 2012 WL 227821, at *2 (citation omitted). Here, there was nothing else that occurred.

Defendant argues that because U.S. law enforcement officials were aware of when the Philippine officials were going to arrest the defendant, the Philippine officials were agents of the United States. Sharing information does not convert someone into an agent. As SA Atsatsang testified, he had no law enforcement authority in the Philippines. Tr., at p.59. He asked the Philippine officials for help in locating defendant, but if they did not assist, there was nothing he could do. Tr., at p.63. The Philippine officials were not acting at his directions. Tr., at p.60.

Concerning the arrest, SA Atsatsang testified there was an operation on March 29, 2016, to arrest defendant. The operation was the Philippine Davao NBI's (National Bureau of Investigation) and BI's (Bureau of Immigration) operation. Tr., at pp.25-5. The U.S. agents were there just to observe. Tr., at p.71. It was the Philippine officials' decision when the operation was going to take place. Tr., at p.71. Thus, the Philippine officials were not acting at the direction of the U.S. law enforcement officers.

Sharing information, contrary to defendant's assertion, does not make the Philippine agents, agents of the United States. Defendant argued that sharing information amounted to "play[ing] some role in controlling or directing the conduct of the foreign investigation."

Defendant's Brief at p.18. Defendant emphasizes the "playing some role" but ignores the rest of the sentence: that the role must be in "controlling or directing the conduct" of the Philippine officials. SA Atsatsang repeatedly testified that no U.S. law enforcement officer controlled or directed the conduct of the Philippine officials.

    4.    *The U.S. law enforcement officers were not trying to circumvent the law.*

Defendant asserts that the U.S. law enforcement officials were somehow trying to avoid the U.S. Constitution. SA Atsatsang flatly refuted this allegation. He testified that no one tried to circumvent the laws of the United States nor of the Philippines. Tr., at pp.51-2. Second, SA Atsatsang testified that at the time of defendant's arrest by the Philippine government, he did not know that defendant's suitcase was taken because no United States agent arrived on the property until after defendant was taken from the residence. *See* tr., at p.74. SA Atsatsang also testified that prior to the arrest, he was not aware of anyone requesting Philippine officials to conduct a search, nor had he become aware, after the arrest, that anyone made such a request. Tr., at p.76. Thus, no U.S. law enforcement officers tried to circumvent the laws of the United States or the laws of the Philippines.

    5.    *United States v. Peterson does not apply in this situation.*

Defendant also cites to *United States v. Peterson*, 812 F.3d 486 (1987), for the proposition that United States officials had to have a reasonable belief that foreign seizure complied with foreign law. *Peterson*, however, applies only where the foreign officials are acting as agents of the United States.

In *Peterson*, one of the allegations was that the United States officials participated in an unlawful wiretap conducted in a foreign country. Unlike the case at hand, the U.S. officials in

16

*Peterson* acknowledged that their investigation was a joint investigation. *Id.* at p.490. There, the U.S. officials were involved daily in translating and decoding the wiretap intercepts. They also explained to the foreign officials the relevance of the intercepted communications. The U.S. officials "assumed a substantial role in the case." *Id.*

In the instant case, the U.S. officials did not assume a substantial role, they were only observers. They did not assist with the arrest of the defendant and did not assist with the packing of the suitcase or rolling it out of defendant's house. The U.S. law enforcement officers were not aware that any personal items accompanied defendant when he was arrested. Thus, *Peterson* is inapposite.

    5.  *The evidence should not be suppressed under the Fourth Amendment.*

Assuming, for arguments sake, that the Fourth Amendment applied in the Philippines, there would be no Fourth Amendment seizure because there was no police action. The Fourth Amendment bars government action, not action by those who are not government officials. It was a third party, defendant's wife, who packed his suitcase, not government officials. A fortiori, it was defendant's wife who placed the computers and digital camera in the suitcase with his clothing. Thus, there was no government action and the Fourth Amendment would not be implicated. *Cf. United States v. Gonzalez*, 781 F.3d 422, 428 (8th Cir. 2015) (a private party's action with no government knowledge or participation does not implicate the Fourth Amendment).

Lastly, a search warrant was obtained before the contents of the computers were searched. Thus, the computers were not illegally seized nor were their contents illegally searched.

17

6. *Fruit of the Poisonous Tree Doctrine is Inapplicable.*

The Supreme Court has held that "the exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and, . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.' But the significant costs of this rule have led us to deem it 'applicable only ... where its deterrence benefits outweigh its substantial social costs.' 'Suppression of evidence ... has always been our last resort, not our first impulse.'" *Utah v. Strieff*, 136 S.Ct. 2056, 2061 (2016) (citations omitted).

As stated above, there was no illegal conduct committed by either the United States or the Philippine governments. If the Philippine officials somehow violated their law by rolling out defendant's suitcase when he was arrested, that illegality was not egregious, and the evidence should not be suppressed.

## IV. CONCLUSION

For all of the foregoing reasons, as well as those contained in previously filed briefs, the defendant's motion to suppress evidence and motion to dismiss should be denied.

    Respectfully submitted,

    JEFFREY B. JENSEN
    United States Attorney


    */s/ Robert F. Livergood*
    ROBERT F. LIVERGOOD, 35432MO
    Assistant United States Attorney
    111 S. 10th Street, Rm. 20.333
    St. Louis, Missouri 63102
    (314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2017, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Mr. Robert Wolfrum
Assistant Federal Public Defender.

                                              */s/ Robert F. Livergood*
                                              ROBERT F. LIVERGOOD, 35432MO
                                              Assistant United States Attorney