UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16CR83 HEA/NCC |
| | ) | |
| MICHAEL BRUCE McDONALD, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM, AND REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

Defendant filed a Motion to Dismiss Due to Unconstitutional Vagueness (Doc. No. 46); Motion to Suppress Physical Evidence and Statements (Doc. No. 47), and Supplement to Motion to Suppress (Doc. No. 56); and Supplemental Motion to Suppress Physical Evidence (Doc. No. 62). The government filed its responses (Doc. Nos. 50, 64). A hearing was held on Defendant's motions and a written transcript was filed (Doc. No. 69). Post-hearing briefs were filed by both parties (Doc. Nos. 74, 78). Based on the evidence and testimony adduced, as well as a review of the transcript of the hearing held in this matter; and having had an opportunity to evaluate the credibility of the witnesses presented and to observe their behavior, the undersigned makes the following finds of fact and conclusions of law.

## FINDINGS OF FACT

On February 24, 2016, defendant Michael Bruce McDonald was indicted in this district for transportation of child pornography as a result of an undercover police investigation by Saint Louis County, Missouri detectives.  Investigators were aware that defendant, who is an American citizen, was living abroad near the island city of Davao in the Philippines.  Defendant lived with his Filipino wife and several minor females.  Upon indictment, the United States Department of State notified the Philippines Bureau of Immigration (BI) through the Federal Bureau of Investigation (FBI) that defendant's passport was revoked.  He was not extradited.  U.S. law enforcement officials anticipated that defendant would be arrested and deported from the Philippines because of the change in his travel status when his passport was revoked.  *See* (Def. Ex. 1).

Saint Louis investigators were communicating with FBI Special Agent Tenzin Atsatsang who was living and working in Manila, Philippines on a three-month assignment as the manager of the FBI's program regarding child sex tourism.  He had no law enforcement authority in the Philippines, nor could he induce foreign officials to act on information that he provided to his Philippine counterparts.  The Philippine government's mutual cooperation with FBI investigations is generally voluntary.  Agent Atsatsang's role abroad was as a liaison to Philippine federal law enforcement officials about FBI investigations.  He was also the point of contact for FBI Special Agent Nikki Badolato in Saint Louis.

Agents Atsatsang and Badolato testified for the government at the evidentiary hearing in this case.  The FBI agents knew that the governments of the Philippines and the United States were aware of defendant McDonald's location for nearly a month

before his planned arrest.  Philippine authorities shared surveillance photographs taken by their law enforcement officers to confirm that defendant McDonald lived near Davao City on the island of Mindanao.  The FBI had discussions with Filipino law enforcement officials about the process of revoking defendant's passport, issuing a temporary passport, and executing a warrant for his arrest.  The authorities in the Philippines provided the FBI with status updates about their monitoring of defendant McDonald. Agent Atsatsang had a general idea of the internal procedures that would result in defendant's deportation from the Philippines.  And local assistance was needed to find and secure defendant McDonald's removal.

Agent Atsatsang was aware of logistical and safety challenges around Davao. The area is occupied by a terrorist group known as Abu Sayaf.  Law enforcement officials fear that kidnappings of foreigners can occur, especially American visitors. Agent Atsatsang knew that he would need special permission to go to the island by U.S. State Department security officers.  He was also aware that the legal system and criminal justice system in Davao could be impeded by delays, which could impact securing defendant's return to the United States.

When the Philippines BI informed Agent Atsatsang that they planned to arrest defendant for being out of status, he flew to Davao to be present on March 28, 2016. Defendant was arrested by Philippine officials on March 29th.

### *Defendant's Deportation Arrest*

Agent Atsatsang was near the house at the time of defendant's deportation arrest. He was riding in one of the three vans that approached the vicinity of defendant's

residence.  The vehicles parked about one hundred feet[1] away from the house.  The first

van (van #1) had officers with the National Bureau of Investigation (NBI) who were

stationed in Davao and also Davao Bureau of Immigration officers.  NBI officers from

Manila rode in the second van to rescue any alleged victims.  Agent Atsatsang rode in the

third van with caseworkers from the Philippine department of social welfare and with

Assistant Legal Attaché, Alexander Gordon, who told Agent Atsatsang that the FBI's role

was strictly limited to observation.  The Legal Attaché's Office also communicated with

Agent Badolato.  Agent Atsatsang did not direct the actions of the Philippine agents.  He

did not ask them to seize anything from defendant's home.  Agent Atsatsang did not

attempt to circumvent the laws of the United States in his actions.  Additionally, the FBI

was not aware of any search warrant issued through a Philippine court or any

investigation by the Philippine government about McDonald prior to March 29th.

The occupants of van #1 oversaw defendant's arrest and told the occupants of the

third van, including Agent Atsatsang, when defendant McDonald was secured.  Agent

Atsatsang did not see the arrest, nor did he communicate with Philippine arresting

officers.  He did not see defendant McDonald's personal belongings.  Philippine law

enforcement was aware that defendant had a suitcase packed to travel with him.  He did

not know the content of defendant's personal belongings.  The Agent's view was blocked

by the second van and there was no means of communication between the vehicles.  He

did not see van #1 leave the house with defendant McDonald.  Agent Atsatsang

approached the property after van #1 departed to the local Bureau of Immigration office.

He stood inside the residence for approximately 20 seconds to look for the alleged

---

[1] Agent Atsatsang testified that van #3 in which he rode was either 100 feet or 100 yards
away from defendant's house.

4

victims.  NBI and BI agents also entered the house.  Agent Atsatsang was present at the house for a couple of hours.

After leaving defendant's home, Agent Atsatsang traveled to the local BI Office in Davao City where defendant McDonald was in custody.  Upon arriving at the BI office, he saw defendant McDonald seated in a room but could not see if his hands were cuffed.  Defendant did not appear to have been mistreated by officials.  Defendant McDonald appeared to be alert and uninjured.  He was processed through the Philippine legal system, including an inventory search of his bag by Bureau of Immigration officials on March 29, 2016.  *See* (Gov't Ex. 3).  Defendant signed the form acknowledging that his belongings in his suitcase included a camera, a Dell CPU and a Dell laptop computer.

Agent Atsatsang next saw defendant McDonald at the local airport for transport to Manila by airplane.  Defendant's travel within the country was overseen by Philippine officials.

Agent Atsatsang returned to Manila separately.  A day after defendant's arrest in Davao, officials with the U.S. State Department told Agent Atsatsang that defendant had belongings taken from him while he was in custody.  Later, FBI agents learned from defendant that his wife packed his belongings.

Agent Atsatsang next saw defendant McDonald that evening in Manila prior to his departure to the United States on April 1, 2016.  Defendant appeared to be in good health the last time Agent Atsatsang saw him.  He was lucid.  He did not invoke his right to silence.  He did not request any medication nor did he appear to need any.  Defendant was dressed in a T-shirt and shorts and he apologized for his appearance.  Agent Atsatsang did not search defendant's luggage.

Two other FBI agents arrived in Manila to meet defendant McDonald and to escort him back the United States.  On April 1, 2016, Special Agents Cindy Dockery and Todd Secker escorted defendant on a commercial airliner bound for Los Angeles, California.

Agent Secker also testified at the hearing before the undersigned.  He noted that defendant appeared to be fine when they met at the Manila airport.  He heard defendant thank the Philippine officials for their hospitality.  Defendant had a carry-on bag and a suitcase that was checked into the plane's luggage compartment.  Agents asked the flight crew for their preference about whether defendant should be handcuffed during the flight. The flight crew responded that defendant need not be cuffed so long as there was no problem in the cabin during the 12- to 13-hour flight.  McDonald was not handcuffed. Neither agent was armed.  McDonald sat between the two agents during the flight against the rear cabin wall in the last row.  There were passengers in the row in front of them. Defendant fell asleep shortly after take-off and they interviewed him after he woke up.

Agent Dockery kept a timeline of the events during the flight that was memorialized in a FBI 302 report.  *See* (Gov't Ex. 9).  The report chronicled agents' interactions with defendant by Central Standard Time (CST), including bathroom breaks, his use of blankets when he said that he was cold, and the food and drink he consumed.

| Time | Notes |
|------|-------|
| 7:30 am | Prior to flight takeoff, McDonald was escorted to the restroom. |
| 7:48 am | McDonald asked for the cabin temperature to be raised and was given two blankets. |
| 8:15 am | McDonald ate a meal. |
| 9:00 am | McDonald slept. |

| | |
|---|---|
| 9:23 am | McDonald woke up. |
| 9:27 am | McDonald advised he was cold, but declined a third blanket. |
| 9:30 am | McDonald was given his *Miranda* rights. |
| 11:23 am | McDonald asked for water. |
| 12:04 pm | McDonald was given water by flight attendant. |
| 12:07 pm | McDonald was offered peanuts. |
| 12:25 pm | McDonald wanted to take a break. |
| 12:30 pm | McDonald was escorted to the restroom. |
| 12:40 pm | McDonald declined a snack. |
| 1:40 pm | McDonald woke up from a nap and declined getting up to stretch. |
| 1:45 pm | McDonald went back to sleep. |
| 4:47 pm | McDonald woke up, asked for and received a third blanket. |
| 4:59 pm | McDonald was given his *Miranda* rights again. |
| 5:13 pm | McDonald was given coffee, but declined eating as it was too early for him to eat. |
| 5:47 pm | McDonald asked and was given more coffee. |
| 6:07 pm | McDonald ate a slice of pound cake. |
| 6:10 pm | The interview was concluded. |
| 6:50 pm | McDonald declined going to the restroom. |

Agent Secker was also aware that defendant had a law enforcement background.

He presented defendant with the first of two FBI *Advice of Rights* forms at 9:31 a.m.

(CST).  *See* (Gov't Ex. 10).  Agent Secker read defendant his rights from the form.

Before we ask any questions, you must understand your rights.  You have the right to remain silent.  Anything you say can be used against you in

7

court.  You have the right to talk to a lawyer for advice before we ask you
any questions.  You have the right to have a lawyer with you during
questioning.  If you cannot afford a lawyer, one will be appointed for you
before any questioning, if you wish.  If you decide to answer questions
now without a lawyer present, you have the right to stop answering at any
time.

Defendant McDonald read aloud the following statement and signed the form, which the

two agents witnessed:

I have read the statement of my rights and I understand what my rights
are.  At this time I am willing to answer questions without a lawyer
present.

Neither agent threatened defendant or made him promises regarding the case.  They did

not try to overbear his will.  At no time did defendant invoke his right to remain silent or

ask for an attorney.  He answered some questions and made incriminating statements.  He

refused to discuss other matters about the minor victims.  Agents stopped asking

questions when breaks were requested by defendant, or when a flight attendant offered

services.  He was cordial and alert.  His answers to questions were logical.  Defendant's

age was in his late 70s.

Agent Secker presented a second *Advice of Rights* form to defendant in-flight at

4:59 p.m. (CST) after a nap of nearly three hours.  *See* (Gov't Ex. 11).  He was alert.

Defendant signed the second form.  He made additional statements and he had coffee and

cake on the plane.  Both agents and defendant signed the form.  During questioning about

defendant's use of electronic equipment to photograph the victims, defendant told agents

that his equipment might be in his suitcase.  Agents asked for consent to search the items.

Defendant declined after asking what incentive he had for consenting to a search.  Agent

Secker told defendant that he was not in a position to offer him leniency.  Prior to landing

in Los Angeles, agents asked the flight crew to allow the three of them to depart the airplane first, which they did do.

FBI Special Agent Randall Devine met defendant McDonald and the two agents at the arriving gate at Los Angeles International Airport (LAX).  Agents Dockery and Secker went through a special immigration lane with defendant and turned him over to Agent Devine, who arrested defendant on the indictment in this case.  Agent Devine also testified at the hearing.  He explained that it was his job to meet defendant at the gate and deliver him to a local court for his initial appearance on this case.  Agents told defendant that he would be held at a detention center until he could be presented to a magistrate judge the following day.  Agents Dockery and Secker departed to their hotel.

Agents collected defendant's luggage from the carousel that arrived with the other passengers' belongings after he identified his bag.  Thereafter, Agent Devine opened defendant's luggage for him to confirm it was his bag and ensure that defendant was not mistaken about the identity of the bag.  Defendant complied.  Agent Devine planned to conduct an inventory search of defendant's bag, knowing that his items would be booked into evidence as the best way to keep track of defendant's belongings for safekeeping. Defendant did not object to Agent Devine opening his bag or searching the contents. Agent Devine did not recall asking for consent to open defendant's bag.  Defendant was pleasant and friendly.  Defendant made repeated unprompted incriminating statements regarding the case despite being advised to not make a statement.  No additional *Miranda* warnings were given to him.  Agent Devine told McDonald that he was not present to question defendant, who appeared to him to be lucid, "fine," and coherent.

Agent Devine memorialized his inventory search on April 1, 2016 using a standard FBI Receipt for Property (FD-597). *See* (Gov't Ex. 2). The inventory search took place in a private room controlled by Immigration Customs Enforcement (ICE) at LAX airport. The form bears no signature by defendant but Agent Devine did not recall that defendant refused to sign it. Defendant was polite and cooperative during their encounter. Defendant's suitcase had a computer and other electronic devices in it. Serial numbers for these items were recorded. He asked to smoke one of his own cigarettes and Agent Devine allowed him to do so. Agent Devine did not search defendant's computers.

Additionally, Agent Nikki Badolato testified at the hearing about the FBI's written inventory-search policy. *See* (Gov't Ex. 1). The policy describes the circumstances under which an agent may search an arrested person. The policy states in part:

> Arrested subjects often have purses or shoulder bags, suitcases, vehicles or other personal property capable of containing objects in their possession during an arrest. An inventory of personal property ensures the safekeeping of such property belonging to an arrested subject. It must include both the container and the contents of such container taken into FBI custody.

The policy also notes that "personal property… should be carefully inventoried and promptly, thoroughly searched … prior to be stored for safekeeping." *Id*. Generally, when an item of evidence is seized by the FBI, the item is held by an evidence technician and digital evidence is logged into the agency's computer system. Agent Devine also opened defendant's suitcase to determine whether any contraband or valuables were inside it. FBI policy does not allow for a large and closed suitcase to be booked without making a specific inventory of the items within it. In this case, Amy Houg with the FBI

10

in Saint Louis was the evidence technician who received the items from the Los Angeles FBI office on May 5, 2016.  *See* (Gov't Ex. 3).

Saint Louis County Det. Michael Slaughter checked out the evidence on May 17, 2016.  He is a forensic examiner, who also works with Sgt. Adam Kavanaugh, investigating child sex crimes.  Det. Slaughter testified at the hearing.  Det. Slaughter conducted a forensic examination after investigators obtained a federal search warrant described below.

Det. Slaughter explained the process he used to digitally copy an image of the Dell desktop CPU that was in defendant's suitcase pursuant to the parameters of the search warrant.  He dissembled the desktop and took pictures of it for his forensic report. He used Write Blocker, which allows an examiner to read information stored on the original hard drive.  The image copy was transferred and stored on a computer server used by the police after Det. Slaughter returned the desktop to the evidence technician.

Det. Slaughter explained at the hearing that he conducted only one forensic examination of defendant's actual desktop.  The examination occurred May 2016 with direction from Sgt. Kavanaugh to locate, if possible, the email correspondence between two accounts thought to be used by Sgt. Kavanaugh in his undercover capacity and defendant that led to the indictment in this case.  Det. Slaughter did not locate the email correspondence but he did observe child pornography on the desktop's hard drive. Investigators did not consider the child pornography on the desktop to have evidentiary value when Det. Slaughter viewed it in May 2016 because they believed they had no jurisdiction to pursue conduct alleged to have occurred only in the Philippines.

On May 24, 2017, counsel for the government asked Det. Slaughter to re-examine the image of the hard drive obtained in May 2016 subject to the same parameters in "Attachment A" to the search warrant discussed below.  *See* (Gov't Ex. 5).  He had no new search warrant that authorized the re-examination of the image.

### The May 24, 2016 search warrant[2]

Agent Badolato was the affiant who applied for two federal search warrants for defendant's personal property and a second search warrant for photographs of his body.  *See* (Gov't Exs. 5 and 6).  The search warrant packages are incorporated by reference as if fully set out here.  They are the best evidence of their contents.  The exhibits were received into evidence.  This summary is merely for the trial court's convenience.

The relevant affidavit explained Agent Badolato's belief that there was probable cause for the search warrants to issue.  The affidavit detailed that in August 2015, Sgt. Kavanaugh identified an individual online who was posting and trading child pornography in a Box.com account.  Sgt. Kavanaugh is a task force officer with the FBI.  Investigators researched the "owner" of the Box.com account and found an email address associated with defendant McDonald and, later, Facebook accounts associated with defendant and the girls he said were his daughters.  Sgt. Kavanaugh communicated with the user of the email address, who discussed his sexual relationship with his minor daughters.  Defendant also emailed alleged images of child pornography to Sgt. Kavanaugh.

---

[2] There were two search warrants obtained in this case.  Defendant challenges one of them.  Additionally, the government has proffered that it does not intend to seek to enter evidence at trial related to the search of the Dell laptop.  *See* (*Transcript of Hearing*, pp. 4, 187 and Gov't Ex. 7).

The affidavit also relied on statements made by defendant McDonald to Agents Dockery and Secker on the international flight.  The statements were about defendant uploading sexually-explicit photographs taken with a digital camera of his daughters that were uploaded to a computer to be posted online.  U.S. Magistrate Judge Patricia L. Cohen, the issuing judge, signed the search warrant.

Around May 24, 2017, Det. Slaughter conducted a forensic examination of the Dell desktop, the laptop, and other evidence after counsel for the government requested further examination of the evidence.  *See* (Def. Exs. 2 and 3).  The evidence is held at the Saint Louis County Police Department.

### Defendant's Testimony

Defendant McDonald also testified at the hearing.  He is 77 years old.  In March 2016, he was living in a two-story townhouse in the Belisario Heights neighborhood in the Providence of Mindanao in Davao City in the Philippines.  Defendant lived with his wife and her three nieces, ages 10, 12 and 15.

On March 29, 2016, at around 6:30 a.m., defendant was in his carport to put the girls' backpacks and lunches in the car when he saw 12 to 15 people approaching him. He recognized a woman who worked at the Davao Immigration Office from his visits there to renew his visa.  He also saw a uniformed officer, but the officer stayed outside his house.  A Caucasian man from the U.S. Consulate introduced himself to defendant but they did not speak much thereafter.  The woman told him that she had an extradition order from the United States and that he was to be placed in custody.

Defendant asked to retrieve his medicine from the kitchen above the sink.  He was escorted back inside.  He talked to the girls and went back outside with his wife.  He

13

asked where his wife was and he was told that she was packing his suitcase.  He said,

"Thank you."  Defendant saw a large man that he believed to be a Filipino rolling the

suitcase out of his house.  He did not give consent for anyone to enter his house to bring

those items out and he did not request any items, but he approved of his wife packing his

suitcase.

Defendant understood the term extradition to mean that he would return to the

United States whether he wanted to or not.  He did not know whether he would be

returning to the Philippines and he was upset.  He did not object to his wife packing his

suitcase or that it was brought out of his house to travel with him.  He appreciated that his

bag was packed and he thought it contained his clothes.

## DISCUSSION

## Defendant's Motion To Dismiss Due To Unconstitutional Vagueness (Doc. No. 46)

Defendant is charged with transportation of child pornography in violation of 18

U.S.C. § 2252A(a)(1).  He contends that the term "lascivious" in the statute's language is

not adequately defined and it is vague.[3]  Vague statutes are void.  *See United States v.*

---

[3] 18 U.S.C. § 2256 provides in relevant part,

For the purposes of this chapter, the term--

(1) "minor" means any person under the age of eighteen years;

(2)(A) Except as provided in subparagraph (B), "sexually explicit conduct" means actual or simulated--

(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

(ii) bestiality;

(iii) masturbation;

(iv) sadistic or masochistic abuse; or

(v) lascivious exhibition of the genitals or pubic area of any person;

14

*Williams*, 553 U.S. 285 (2008) and *Johnson v. United States*, 135 S. Ct. 2551 (2015)

(describing the standard for a void for vagueness analysis and ruling the residual clause

of the Armed Career Criminal Act (ACCA) is void for vagueness).  "Vagueness doctrine

is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth

Amendment.  A conviction fails to comport with due process if the statute under which it

is obtained fails to provide a person of ordinary intelligence fair notice of what is

prohibited, or is so standardless that it authorizes or encourages seriously discriminatory

enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008) citing *Hill v.

Colorado*, 530 U.S. 703, 732, 1 (2000); *see also Grayned v. City of Rockford*, 408 U.S.

104, 108–109 (1972).

The Eighth Circuit has opined that "[i]t is axiomatic that criminal statutes must be

drafted with specificity sufficient to give a reasonable person notice that the acts

contemplated are illegal."  *United States v. Freeman*, 808 F.2d 1290, 1292 (8th Cir. 1987)

*cert. denied,* --- U.S. ----, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987).  *See Kolender v.

Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983).  This maxim

is especially true when First Amendment rights are involved.

> However, this does not mean that comprehensive definitions must appear in every criminal statute. The Supreme Court has consistently held that lack of precision, alone, does not violate due process. *See Roth v. United States,* 354 U.S. 476, 491, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498 (1957) " ' * * * [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices * * * * ' " *Roth,* 354 U.S. at 491, 77 S.Ct. at 1312 (quoting *United States v. Petrillo,* 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1541–42, 91 L.Ed. 1877 (1947)).

*Freeman*, 808 F.2d at 1292 (8th Cir. 1987).

In *Freeman*, the Eighth Circuit denied defendants' argument that the term

lascivious was unconstitutionally vague as applied to their conduct of videotaping a

pregnant semi-nude sixteen-year-old girl and recording close ups of her exposed genitals. "We fail to see how men of reasonable intelligence, guided by common understanding and practices, would believe that such conduct is permissible." *Freeman*, 808 F.2d at 1292 (8th Cir. 1987). *See also United States v. O'Malley*, 854 F.2d 1085, 1087 (8th Cir. 1988)(rejecting argument that term "lascivious" is unconstitutionally vague). Moreover, the Eighth Circuit has reasoned that a depiction of a child is a lascivious exhibition of the genitals when "the child is nude or partially clothed, when the focus of the depiction is the child's genitals or pubic area, and when the image is intended to elicit a sexual response in the viewer." *United States v. Horn,* 187 F.3d 781, 789 (8th Cir. 1999)("The meaning of the phrase "lascivious exhibition of the genitals or pubic area" is a matter of law which we review de novo. *Cf. United States v. Amirault*, 173 F.3d 28, 32–33 (1st Cir. 1999), and *United States v. Knox*, 32 F.3d 733, 744 (3d Cir.1994), *cert. denied*, 513 U.S. 1109, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995). Nudity alone does not fit this description; there must be an "exhibition" of the genital area and this exhibition must be "lascivious.", *cert. denied,* 529 U.S. 1029, 120 S.Ct. 1442, 146 L.Ed.2d 330 (2000))." *See also United States v. Rayl*, 270 F.3d 709, 714 (8th Cir. 2001) ("As relevant to this case, "sexually explicit conduct" means "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(E)).

The Supreme Court has long held a similar view. "Respondents argue that § 2256 is unconstitutionally vague and overbroad because it makes the age of majority 18, rather than 16 as did the New York statute upheld in *New York v. Ferber, supra*, and because Congress replaced the term "lewd" with the term "lascivious" in defining illegal exhibition of the genitals of children. We regard these claims as insubstantial, and reject

16

them for the reasons stated by the Court of Appeals in its opinion in this case." (citation omitted). *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78–79 (1994). Likewise here, there exists a collective well of understanding from which ordinary people of reasonable intelligence can draw to understand the outer limits of noncriminal conduct and also what conduct is prohibited by criminal statute. Ordinary people have sufficient notice of prohibited conduct based on these common societal understandings. On its face, the term lascivious when read with the other defined terms gives fair notice to persons of average intelligence of the conduct proscribed. And there is no support for the argument that the statute authorized or encourages seriously discriminatory enforcement. Defendant's argument is unavailing.

The Supreme Court's ruling in *Williams* does not require a different outcome. In *Williams*, the Court reasoned that "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings. *See Coates v. Cincinnati,* 402 U.S. 611, 614 (1971); *Reno, supra,* at 870–871, and n.35, 117 S.Ct. 2329. *Williams*, 553 U.S. 285 at 306. Unlike those vague terms that were scrutinized and found lacking by the Supreme Court, lascivious conduct has been found to have definite legal meaning and is, thus, not a term vulnerable to unconstitutional wholly subjective judgment.

Still, defendant argues the Supreme Court's decision in in *Johnson v. United States*, 135 S. Ct. 2551 (2015) applies to him.  In *Johnson*, the Supreme Court held that the residual-clause definition of the term "violent felony" in the ACCA was unconstitutionally vague.  *See* 18 U.S.C. § 924(e)(2)(B).  The Court applied the "categorical approach" to make this determination—that is to say, the Court "assesse[d] whether a crime qualifies as a violent felony in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion."  135 S. Ct. at 2557 (citation omitted).  The *Johnson* Court's resulting analysis exposed the unconstitutional flaw in the ACCA's statutory scheme because the "indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges."  *Id.*  Even if *Johnson* evidences the Court's permanent retreat from the "categorical approach" when a statute is scrutinized for unconstitutional vagueness, such a sweeping argument is not persuasive in this case.  For all of the foregoing reasons, defendant's Motion To Dismiss should be denied.

**Defendant's Motion To Suppress Physical Evidence and Statements, Supplement to Motion to Suppress, and Supplemental Motion To Suppress Physical Evidence (Doc. Nos. 47, 56 and 62)**

### A.  The Search Of Defendant's Suitcase Was Valid

Defendant argues that U.S. law enforcement officials did not have a warrant to search his suitcase upon his arrival at the airport in Los Angeles on April 1, 2016.  He further argues that no valid exception to the Fourth Amendment's warrant requirement applies to the search at LAX and the evidence should be excluded as fruit of the poisonous tree.  Defendant supplemented his original motion by contending that the

Fourth Amendment should also apply to the Philippine officials' action in Davao because they operated in a joint venture with U.S. law enforcement or they were "virtual" agents of the U.S. government.  Alternatively, he contends that the Philippine constitution applies to the facts surrounding his deportation arrest, and government officials failed to comport their conduct to Article III, Section 2 of the Constitution of the Republic of the Philippines.

The government raises several counter arguments, including that defendant was subject to a border search and a valid inventory search.  Additionally, the government contends that defendant had no expectation of privacy in the suitcase when it was searched; and, even if the search was invalid, the doctrine of inevitable discovery should apply and the exclusionary rule should not apply on these facts.

The Fourth Amendment provides:

> "The right of the people to be secure in their persons,
> houses, papers, and effects, against unreasonable searches
> and seizures, shall not be violated, and no Warrants
> shall issue, but upon probable cause, supported by Oath or
> affirmation, and particularly describing the place to be
> searched, and the persons or things to be seized."

The Supreme Court has inferred that a warrant must be generally secured for the police to search a residence.  *Kentucky v. King*, 563 U.S. 452, 459-460 (2011).  In *Kentucky v. King*, the Court noted that "[i]t is a 'basic principle of Fourth Amendment law,'" we have often said, "'that searches and seizures inside a home without a warrant are presumptively unreasonable.'"  *Id.*, *citing Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (*quoting Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).  "But we have also recognized that this presumption may be overcome in some circumstances because '[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.''"  *Kentucky v. King*,

19

563 U.S. at 459. *Brigham City*, *supra*, at 403; *see also Michigan v. Fisher*, 558 U.S. 45, 47, 130 S.Ct. 546, 548, 175 L.Ed.2d 410 (2009) (per curiam). Accordingly, the warrant requirement is subject to certain reasonable exceptions. *Brigham City*, *supra*, at 403.

### i. The FBI's inventory search was reasonable and consistent with written policy

At issue is whether Agent Devine violated the Fourth Amendment by opening the suitcase to catalogue the items and obtaining the serial numbers for the electronic equipment. "Inventory searches are one exception to the general rule that searches conducted without a warrant are unreasonable." *United States v. Smith*, 715 F.3d 1110, 1117 (8th Cir. 2013). The courts have long held that such searches serve "three distinct needs: the protection of the owner's property while it remains in police custody ... the protection [of] the police against claims or disputes over lost or stolen property ... and the protection of the police from potential danger." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (citations omitted). "An inventory search must 'be reasonable under the totality of the circumstances ... and may not be a ruse for general rummaging in order to discover incriminating evidence.'" *Smith*, 715 F.3d at 1117 (alteration in original) (quoting *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011)). To evaluate the reasonableness of the inventory search, the courts look to whether it is "conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as a purposeful and general means of discovering evidence of a crime." *Id.* (quoting *Taylor*, 636 F.3d at 464).

Agent Devine explained at the hearing that defendant had no one to meet him when he arrived at LAX or keep his belongings. He was under arrest and he was to be housed at a detention facility until his initial appearance the following day. The

inventory search was standard procedure to keep defendant's items safe while he was in his custody.  Moreover, defendant did not object to the suitcase traveling with him to the United States, especially given the circumstances of his abrupt departure, the distance he would travel, and his expectation that he might not return.  Defendant testified that he told individuals present, "thank you" when he found out that his wife was packing a suitcase for him.

Importantly, there is no evidence that anyone with the FBI knew for certain that defendant's suitcase contained electronics of evidentiary value.  Defendant's wife packed the suitcase and a Philippine person removed it from the house.  Agent Atsatsang did not see the suitcase or know that defendant had it with him—and never knew what was contained inside it, until U.S. State Department officials told the agent that a suitcase traveled with defendant to Manila the day after arrest.  There is no indication that any agents, American or Filipino, opened the suitcase to rummage around with a purposeful means to discover evidence.  Rather, each of the three *Opperman* needs were satisified.  *Id.* at 369.  At the same time, there is no evidence that defendant did not maintain his expectation of privacy in the suitcase's contents when the man rolled it out of defendant's house and into one of the transport vans.  *California v. Greenwood*, 486 U.S. 35, 39 (1988).  In other words, no one could testify about whether any Philippine person at the house, other than defendant's wife, saw the inside of his suitcase.

In *United States v. Ball*, 804 F.3d 1238, 1241 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 1209 (2016), the Eighth Circuit shrewdly noted that officers "may not raise the inventory-search banner in an after-the-fact attempt to justify what was ... purely and simply a search for incriminating evidence," but they are permitted to "keep their eyes

open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime." *See also United States v. Beal,* 430 F.3d 950, 954 (8th Cir. 2005).  Thus, there is no prohibition against the FBI investigation benefiting from observing the equipment.

Alternatively, "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border."  *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *see, e.g., D.E. v. John Doe*, 834 F.3d 723, 727 (6th Cir. 2016), *cert. denied sub nom. D.E. v. John Doe 1*, 137 S. Ct. 2246 (2017) (upholding validity of border search of an American motorcyclist who took a wrong turn without crossing the border with Canada and was nevertheless subject to a search by Customs and Border Protection agents).  Accordingly, defendant did not have a reasonable expectation of privacy in the contents of the suitcase at LAX, and agents could also conduct a reasonable inventory of its contents post a valid search after a border crossing.  The government has met its burden on these facts and the exclusionary rule should not apply.

To the extent that defendant suggests that Agent Devine's actions of recording the serial numbers was an invalid unrelated search, this is not persuasive.  This case is not like *Arizona v. Hicks*, 480 U.S. 321 (1987).  In *Arizona v. Hicks*, a police officer entered respondent's apartment under exigent circumstances to search for the shooter, victims and weapons when a bullet fired through his floor injured a man in an apartment below. *Id.* at 323.  In addition to seizing weapons and a stocking-cap mask, an officer moved respondent's stereo equipment to observe the serial numbers, suspecting the equipment

was stolen.  The Supreme Court held that the act of moving the equipment constituted a "'search' separate and apart from the search for the shooter, victims, and weapons that was the lawful objective of his entry into the apartment."  *Id.*  Further, the Court concluded "[b]ut taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that validated the entry."  *Id.* at 325.  Here, Agent Devine was recording serial numbers to ensure the safekeeping of defendant's equipment, not to identify it for future forensic searching.  His actions were reasonably related to the written inventory policy.

Moreover the undersigned notes that a violation of the Fourth Amendment does not automatically trigger the application of the exclusionary rule.  *Herring v. United States*, 555 U.S. 135, 141 (2009) (citing *United States v. Leon*, 468 U.S. 897, 905–06 (1984)).  The court must determine "the efficacy of the rule in deterring Fourth Amendment violations in the future." *Id.* at 141 (citing *United States v. Calandra*, 414 U.S. 338, 347–355 (1974); *Stone v. Powell*, 428 U.S. 465, 486 (1976)). The court must weigh the benefits of applying the rule against its costs.  *Id.*

### ii.  No joint venture occurred between American and Philippine law enforcement

Moreover, the facts of this case do not support a factual finding that the officials of the United States and the Philippines operated the type of joint venture that has mustered close judicial scrutiny in other circumstances.  There was certainly cooperation between the two nations to facilitate defendant's removal from Davao for his passport revocation, but there is no evidence the law enforcement officers of the Philippines were agents of the United States such that their conduct triggered Fourth Amendment

23

protections.  The parties have not cited to relevant law in this Circuit and the undersigned is not aware of a controlling case.  The law of other Circuits provides helpful guidance.

> "[I]f U.S. agents substantially participate in an extraterritorial search of a U.S. citizen and the foreign officials were essentially acting as agents for their American counterparts or the search amounted to a joint operation between American and foreign authorities, the Fourth Amendment generally applies." (citations omitted); *cf. United States v. Marzano*, 537 F.2d 257, 269–71 (7th Cir. 1976) (holding that FBI agents who merely supplied information to Grand Cayman police and observed but did not participate in the search by authorities in that country did not trigger Fourth Amendment protection).

*United States v. Stokes*, 726 F.3d 880, 890–91 (7th Cir. 2013). The Second Circuit has held that "suppression is generally not required when the evidence at issue is obtained by foreign law enforcement officials."  *United States v. Lee*, 723 F.3d 134, 140 (2d Cir. 2013); *see also United States v. Busic*, 592 F.2d 13, 23 (2d Cir. 1978) ("[T]he Fourth Amendment and its exclusionary rule do not apply to the law enforcement activities of foreign authorities acting in their own country.").  In reaffirming the general rule against suppressing evidence collected by foreign law enforcement authorities abroad—a rule occasionally referred to as the "international silver platter doctrine," *see Lee*, 723 F.3d at 139 n.3 (noting "the substantive viability of the international silver platter doctrine, if not the clarity of its moniker").  *United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013). The Court in *Getto* noted two exceptions that do not apply to this case.  "First, where the foreign government's conduct is so extreme that it shocks the judicial conscience and second, where cooperation with foreign law enforcement … may implicate constitutional restrictions."  *Id.* at 228.

McDonald testified that he did not give consent and there was no search warrant. Assuming *arguendo* that Philippine authorities had no other valid basis to enter under Philippine law, this fact alone does not appear to rise to the level of shocking government

behavior that has been ridiculed by other courts.  Of course no court would encourage the gross disregard of constitutional norms.  However, "[w]e have accordingly held that conduct did not shock the judicial conscience when, for example, there was no act "of torture, terror, or custodial interrogation of any kind," [United States v.] *Gengler*, 510 F.2d [62] at 66 [(2d Cir. 1975)], or when there was "no claim of 'rubbing pepper in the eyes,' or other shocking conduct," *United States v. Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir.1970).  *See also United States v. Emmanuel*, 565 F.3d 1324, 1331 (11th Cir. 2009)("The shocks the judicial conscience standard is meant to protect against conduct that violates fundamental international norms of decency." (internal quotation marks omitted)); *United States v. Mitro*, 880 F.2d 1480, 1483–84 (1st Cir. 1989) (same).

And here at home, U.S. law enforcement officers do not always seek a warrant to enter a home and such circumstances may be entirely lawful given a myriad of factual circumstances.  *See United States v. Matlock*, 415 U.S. 164, 171 (1974) (holding that consent may be given either by the suspect or by some other person who has common authority over, or sufficient relationship to, the item to be searched).  Under the "emergency aid" exigency exception, for example, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, supra,* at 403; *see also, e.g.*, *Fisher, supra*, at 47, 130 S.Ct. at 548 (upholding warrantless home entry based on the emergency aid exception).  Similarly, courts recognize that police officers serve a "community caretaker" function such that "[a] police officer may enter a residence without a warrant ... [when] the officer has a reasonable belief that an emergency exists requiring his or her

attention," and to protect property. *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) (citing *Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978)).

Moreover, defendant McDonald acknowledges that the Supreme Court has not addressed the issue of whether an extraterritorial search needs to meet the warrant requirement or the more general reasonableness requirement of the Fourth Amendment. *See In re Terrorist Bombings*, 552 F.3d 157, 167, 171-174 (2d Cir. 2008). At the very least, *if* there was a joint venture between these nations' officers, the limited facts known about the actions taken by Philippine law enforcement in this case meet the general reasonableness requirement of the Fourth Amendment based on the exigency involving the minors at risk who were living with defendant. There is no evidence to support defendant's joint venture/agency claim.

The case cited by defendant is dissimilar to this case. In *United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987), the Ninth Circuit held that there are circumstances where the Fourth Amendment and the law of the Philippines applied to a joint operation where the DEA agents and Philippine officials seized a vessel with suspected marijuana based on wiretaps conducted in the Philippines targeting an American. *Id*. at 490. "If, however, United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials, the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable." *Id.* "Generally, the exclusionary rule does not apply to searches conducted by foreign authorities in their own countries." *See also United States v. McVicker,* 979 F. Supp. 2d 1154, 1180 (D. Or. 2013) (citing *United States v. Rose*, 570 F.2d 1358, 1361 (9th Cir. 1978)). There is a lack

26

of evidence that Philippine law enforcement officials illegally searched defendant's house and possessions. And while there is support in the record that a Filipino man seized defendant's suitcase, it does not follow that such seizure was done to search it or to obtain evidence. Rather, it was done to hasten his departure to the United States and defendant appreciated that he had some belongings with him because he believed that he might not ever return. The Philippine government cannot be said to have seized his suitcase for evidence when officials facilitated his departure from Davao, and he knew the suitcase would go unimpeded with him.

Agent Atsatsang strictly adhered to his role as observer after supplying information to Philippine police about defendant's indictment and revocation of his passport. The FBI investigation did not involve the Philippine government prior to defendant's indictment. There was no effort to evade constitutional requirements applicable to U.S. investigators. FBI agents took steps to consult with legal counsel. In particular, defendant fails to note that the FBI investigation and subsequent indictment by a federal grand jury in Saint Louis was completed prior to Philippine involvement in the deportation matter. Any assistance provided by the Philippine government prior to April 1, 2016 was simply to effect defendant's deportation and expulsion. There was no joint effort to investigate allegations of child pornography against defendant. Thus, the Fourth Amendment does not apply to the Philippine officials' conduct in this case, although it seems the conduct was constitutional.

### iii.    The search warrants were supported by probable cause

To the extent that defendant challenges the search warrants obtained in this case, the undersigned finds that they were based on probable cause and relied upon in good

faith.  The Supreme Court has defined probable cause to search as "a fair probability that the contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  To be valid, a search warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be searched.  *Johnson v. United States*, 333 U.S. 10 (1948); *Warden v. Hayden*, 387 U.S. 294 (1967).  *See also*, *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006)) and Fed. R. Crim. P. 41.

### iv.    Investigators did not violate Fed. Rule of Crim. P. 41 or the Fourth Amendment's warrant requirement by re-examining the Dell hard drive

Defendant argues that a second search of the Dell desktop in May 2017 was not authorized by the May 24, 2016 search warrant, which was expired; and, because the prior search revealed nothing of evidentiary value, there was no probable cause for a new search warrant to issue.  Det. Slaughter's credible testimony at the hearing clarified some factual ambiguities on this point.

Defendant's argument is premised in part on two police reports prepared by Det. Slaughter on May 25, 2016 and June 29, 2017, respectively, that stated among other things that 1) a forensic examination of the Dell desktop's hard drive was conducted after the hardware was dissembled and a mirror image was copied for further examination, and 2) nothing of evidentiary value was found as a result of the forensic examination.  *See* (Def. Exs. 2 and 3).  The June 29, 2017 police report explains the process Det. Slaughter used to dissemble the desktop on May 24, 2016.  The written report is unclear as written

28

inasmuch as it can be read to suggest that the dissembling process occurred on or about May 24, 2017.  Thus, defendant argues that investigators directed a second improper search of the original desktop without a new search warrant.

At the hearing, Det. Slaughter explained that the second forensic examination on May 24, 2017 was only of the mirror image of the desktop, which was already saved on the police server since May 2016.  The original evidence was not re-examined.  Det. Slaughter also testified that he did observe what he believed to be child pornography on the Dell when he conducted the May 2016 forensic examination.  However, his characterization that there was no evidence of value on the Dell was due to investigators' belief that any such child pornography was possessed in the Philippines and, therefore, outside the jurisdiction of his team's ability to seek prosecution in Saint Louis.

Det. Slaughter's testimony clarifying these issues is significant because Fed. R. Crim. P. 41(e)(2)(B) provides:

> **(B) Warrant Seeking Electronically Stored Information.** A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

*Id.*  Additionally, the scope of the May 24, 2017 search was consistent with the original parameters of the May 24, 2016 search warrant.  Thus, the government did not exceed the scope of the search warrant by conducting a re-examination.  *See, e.g., United States v. Johnston*, 780 F.3d 934, 942-43 (9th Cir. 2015)(upholding searches by the same investigators of mirror image of defendant's hard drive five years after image was created for the same purpose).

Investigators' actions in this case did not cross an inviolable purpose of the Fourth Amendment—to pushback against the British crown's use of "general warrants" against colonials who despised their use. "General warrants gave British officials 'blanket authority to search where they pleased' for evidence of law violations. [*Payton v. New York,* 445 U.S. 573] at 583 n.21; *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)." *United States v. Hulscher*, No. 4:16-CR-40070-01-KES, 2017 WL 1294452, at *4 (D.S.D. Feb. 10, 2017), report and recommendation adopted as modified, No. 4:16-CR-40070-01-KES, 2017 WL 657436 (D.S.D. Feb. 17, 2017)(adopting recommendation to suppress evidence discovered after a second search of cellular telephone by federal agents who investigated defendant for crimes unrelated to prior state investigation where search warrant for cellular telephone was obtained). This is not a case where the government overreached to mine unauthorized for digital data to use against defendant McDonald. His argument should be denied.

### v.   Investigators relied in good faith on the issuance of the search warrants

Further, *United States v. Leon*, 468 U.S. 897 (1984), provides that it is reasonable for investigators who executed the warrant to rely upon it in good faith. In *Leon*, the Supreme Court considered whether the exclusionary rule ought to be applied in the case where the lower courts concluded that the subject search warrant was not supported by probable cause in the attached affidavit. The Supreme Court weighed the question of whether the issuing judge acted with detached and neutral scrutiny and decided if so, then the judge's probable cause ruling should be given deference. 468 U.S. at 913-14. Next, the Supreme Court considered that deference to the issuing judge may diminish in light of the type of knowing or reckless falsity in the affidavit that was the subject of *Franks*, 438

U.S. 154 at 169.  This record does not support a knowing or reckless falsity.  *United States v. Finley*, 612 F.3d 998, 1002-03 (8th Cir. 2010).  Additionally, the Supreme Court considered whether the form of the issued warrant was technically sufficient.  *Id.* at 921.  There is no evidence here to the contrary.

In evaluating a search under *Leon*, we "must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant."  *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015).  As discussed in detail above, the search warrants issued here meets the requisite criteria set forth in *Leon* and its progeny.  Because the affiant had probable cause to apply for search warrants and investigators relied in good faith on their issuance, the evidence was seized and searched lawfully.

**B.  Defendant Waived His Right To Remain Silent And He Was Not Coerced**

McDonald claims that agents made him an "implied" promise that if he told the truth, things would be easier for him.  *See* (Def. Motion To Suppress, Doc. No. 47).  He also claims that his will was overborn by the length of detention, repetitive questioning and his age.  These claims are not supported by the record.

Under the Fifth Amendment, "[n]o person … shall be compelled in any criminal case to be a witness against himself."  U.S. Const. Amed. V.  When a defendant is both in custody and interrogated, he must be advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  "Officers must provide Miranda warnings to suspects in custody because 'the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements."  *United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011)

(internal quotation marks omitted)).  *See United States v. Crisolis–Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014) ("Interrogation in the Miranda context refers to express questioning and to words or conduct that officers should know is reasonably likely to elicit an incriminating response from the suspect." (quotation omitted)). "*Miranda* warnings are required only where a person's freedom has been so restricted as to render him 'in custody.'" *United States v. Martinez*, 462 F.3d 903, 908 (8th Cir. 2006), *cert. denied*, 549 U.S. 1272, 127 S.Ct. 1502, 167 L.Ed.2d 241 (2007) (quoting *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004)).

The undersigned is not persuaded by the government's argument that defendant was not in custody during the overseas flight.  Clearly, the Philippine government expected that defendant would be deported back to the United States and not be left alone in Manila to board a flight of his own volition.  Not only did FBI agents take measures to physically escort defendant during the international flight, they monitored his movements onboard and consulted with the flight crew about whether he should be handcuffed. Agents decided that McDonald need not be handcuffed because they were present to assure no trouble occurred; otherwise he would have been handcuffed.  Agents Secker and Dockery sat on either side of defendant during the flight.  Under the totality of the circumstances, he was not free to leave for Fifth Amendment purposes.

Additionally, the evidence shows clearly that McDonald knowingly waived his *Miranda* warnings two times during the international flight.  He signed the forms presented to him.  He did not change his mind about being interviewed by Agents Dockery and Secker, nor did he invoke his right to silence.

The question of whether a defendant's will is overborne or statements lacked the requisite voluntariness does not depend on *Miranda* warnings being given. "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." *Dickerson v. United States*, 530 U.S. 428, 444 (2000). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012) (citation and internal quotation marks omitted). The court "consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id*. (alteration in original) (citation and internal quotation marks omitted). The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412 (1986). *United States v. Castro–Higuero*, 473 F.3d 880, 886 (8th Cir. 2007) (internal quotation omitted).

Relevant to this inquiry is whether an accused has knowingly and voluntarily waived *Miranda* rights – an inquiry which depends upon the facts of each particular case, including the defendant's background, experience, and conduct. *United States v. Boyd*, 180 F.3d 967, 977 (8th Cir. 1999). "The government has the burden of proving that the defendant 'voluntarily and knowingly' waived his rights." *Id*. This burden is a heavy one. *Lamp v. Farrier*, 763 F.2d 994, 996 (8th Cir. 1985) (citing *North Carolina v. Butler*,

441 U.S. 369, 373 (1979)).  "The courts must presume that a defendant did not waive his

rights; the prosecution's burden is great; but in at least some cases waiver can be clearly

inferred from the actions of the person interrogated."  *Butler*, 441 U.S. at 373.  The

appropriate test for determining the voluntariness of a confession is "whether, in light of

the totality of the circumstances, pressures exerted upon the suspect have overborne his

will."  *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992) (quoting *United

States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989)).   In analyzing the "overborne

will" test, the court looks at the conduct of the officers and the capacity of the suspect to

resist pressure to confess.  *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)).  The

statement must be voluntary and not the product of any police conduct by which the

defendant's will is overborne.  *Haynes v. Washington*, 373 U.S. 503 (1963); *Colorado v.

Connelly*, 479 U.S. at 170.  However, as the Supreme Court stated in *Berkemer v.

McCarthy*, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable

argument that a self-incriminating statement was 'compelled' despite the fact that law

enforcement authorities adhered to the dictates of Miranda are rare."  *Id.* at 433 n.20;

*Dickerson*, 530 U.S. at 444.

McDonald was a 76-year-old man at the time of his arrest.  He has had contact

with the police in the past related to his criminal history, and had some work experience

in law enforcement.  He was given his *Miranda* warnings two times on the international

flight.  Prior to the flight, defendant was transported and held by Philippine authorities.[4]

---

[4] Defendant includes in his Motion an estimated length of time he was held prior to
landing in the United States.  *See* (Doc. No. 47, p. 8).  There was no evidence at the
hearing of such detention prior to his custody with FBI agents in Manila.  The
government does not dispute defendant's timeline.  Regardless, the undersigned finds that
defendant's detention with Philippine officials did not overbear his will.  He did not

There is no evidence that McDonald was under the influence of drugs or alcohol at the time he made his statements, or that he suffered any mental infirmity. There is no evidence that he was unable to understand the nature of the questions posed to him or why he was asked those questions. He had food, drink and blankets for his comfort. He slept for three hours during one stretch of the flight. He did not appear to be disoriented. Although confined to a seat like all passengers on a long flight, the arrangements were no design of law enforcement. Defendant was in the open cabin like everyone else. He was not interviewed continuously. He was not threatened, intimidated or otherwise abused by agents during the questioning. Agents took breaks and the questioning was not continuous for the length of the flight. He flew without being handcuffed. McDonald answered some questions and refused to discuss other topics, which evidenced his ability to set limits on what he would and would not say. Being confronted with evidence of a crime is not patently coercive and there is no evidence that any promises were made to him.

It is notable that McDonald asked about the benefit to himself if he made statements. Agents told him that they could not promise leniency. Thus, there is no evidence that any promise, express or implied, was made to defendant. McDonald attempted to negotiate a bargain by asking what he would gain if he gave consent to search his equipment. All of this suggests that McDonald understood what was said to him and his responses to questions were intelligent and freely given to Agents Dockery and Secker.

---

appear to have been mistreated and he thanked the officials for their hospitality upon his departure.

Likewise, at the evidentiary hearing in this case, which occurred more than a year after this arrest and ongoing pretrial detention, defendant had the ability to recall events with certainty and clarity.  Much of his testimony was consistent with the government's witnesses.  Thus, his advanced age does not appear to have been a significant factor that would cause the undersigned to find that he was coerced into making a statement to any agents in this case.

Moreover, any statements defendant McDonald made later, post-*Miranda*, to Agent Devine should not be suppressed.  Defendant's response to Agent Devine's question to which he affirmatively identified his suitcase was not intended to seek answers to incriminating questions because the agents did not know what was inside his suitcase.  Any other statements made by defendant appear to have been spontaneous despite Agent Devine's admonishments to defendant McDonald to remain silent.  Because the statements were not the result of any threats, promises or coercion by the officers, his statements were voluntary.  *Colorado v. Connelly*, 479 U.S. at 170.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Michael Bruce McDonald's Motion for Leave to File Supplemental Motion to Suppress (Doc. No. 61) is **GRANTED**.

**IT IS HEREBY RECOMMENDED** that Defendant Michael Bruce McDonald's Motion to Dismiss Due to Unconstitutional Vagueness (Doc. No. 46) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant Michael Bruce McDonald's Motion to Suppress Physical Evidence and Statements (Doc. No. 47), and

Supplement to Motion to Suppress (Doc. No. 56); and Supplemental Motion to Suppress

Physical Evidence (Doc. No. 62) be **DENIED**.

**IT IS FINALLY ORDERED** that this cause will be set for trial by separate order

of United States District Judge Henry E. Autrey

The parties are advised that they have fourteen (14) days to file written objections

to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension

of time for good cause is obtained.  Failure to timely file objections may result in the

waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356, 357 (8th

Cir. 1990).


/s/Noelle C. Collins
United States Magistrate Judge


Dated this 29th day of November, 2017.