**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 4:16 CR 83 HEA |
| MICHAEL BRUCE MCDONALD, | ) |
| | ) |
| Defendant | ) |

**GOVERNMENT'S POST-HEARING BRIEF IN OPPOSITION TO DEFENDANT'S**
**SUPPLEMENTAL MOTION TO SUPPRESS STATEMENTS**

COMES NOW, the United States of America, by and through Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Robert F. Livergood, Assistant United States Attorney for said District, and for its "Post-Hearing Brief in Opposition to Defendant's Supplemental Motion to Suppress Statements," (Doc. #103), states as follows:

**I.     INTRODUCTION**

The defendant has been indicted on one count of transportation of child pornography. On July 6, 2018, the defendant filed his motion to suppress statements made on a flight between the Philippines and the United States. Defendant moved to suppress his statements because he claimed that agents of the Federal Bureau of Investigation (FBI) arrested defendant in violation of Rule 4(c)(2) of the Federal Rules of Criminal Procedure. Defendant argued that as a result, the statements made to the FBI agents should be suppressed because the statements were the product of an unlawful arrest.

The Government claims that the FBI agents did not violate Rule 4(c)(2) and the statements should not be suppressed. Even if the Court determines that the agents arrested

defendant in violation of Rule 4(c)(2), the Government contends that statements should not be suppressed because there was probable cause to arrest defendant, and defendant knowingly and voluntarily waived his *Miranda* rights and before being questioned and the subsequent statement was freely and voluntarily made.

The Government relies upon its previous filings and incorporates them herein by reference.

## II.    FACTS

Michael Bruce McDonald, the defendant, was indicted in *United States v. McDonald*, on February 24, 2016. Special Agent Nikki Badolato testified at the evidentiary hearing that defendant was living in the Philippines at the time of the Indictment. *Evidentiary Hearing Transcript* ("Tr."), at pp. 8-9. At the time, Special Agent Tenzin Atsatsang was an FBI agent stationed in the Philippines, though he had no law enforcement authority there. Tr., at p. 59. His job was to manage the Child Sex Tourism program out of Manila and his "primary function was to be a liaison with the Philippine federal law enforcement officials in furtherance of FBI investigations." Tr., at pp. 57-58.

As a result of the Indictment, defendant's U.S. passport was revoked and the Philippine government was going to deport the defendant.

On either March 28, or March 29, 2016, SA Todd Secker and SA Cindy Dockery of the FBI flew to Manila, Philippines. Tr., at pp. 134-35. Neither agent brought a weapon with them to the Philippines. Tr., at p. 139; *Magistrate Judge's Memorandum and Report and Recommendation*, (Doc. #80), at p. 6.  On April 1, 2016, the special agents met defendant at the airport in Manila. Tr., at p.136. Officials from the FBI were also present at the airport, including SA Atsatsang. Tr., at p.137. Defendant was in the custody of the Filipino officials at that time.

Tr., at p. 136. Defendant was in fine condition, was standing, and did not appear to have any issues. Tr., at p.136. Defendant did not indicate to special agents that he had been mistreated by the Philippine government in any way, and he did not have any physical markings or anything on him to show that he was mistreated in any way. Tr., at p. 141. Prior to boarding the plane, defendant thanked the Filipino officials for their hospitality. Tr., at p. 141. Defendant had a carry-on bag and a suitcase with him. Tr., at pp.137-38. Defendant took his carry-on bag with him onto the plane and the suitcase was checked into the airplane. Tr., at p.138.

At the October 3, 2018 evidentiary hearing, Special Agent Todd Secker testified that the Filipino officials had custody of defendant and walked defendant to the gate to board the plane. The Philippine officials removed the handcuffs from defendant and transferred defendant to SA Secker. Defendant was not handcuffed at that time nor during the flight.

SA Dockery, in the meantime, had checked with the flight attendants about securing the defendant. All agreed that as long as defendant behaved himself, he would not be handcuffed during the flight. Defendant was not handcuffed during the flight from the Philippines to the United States.

Additionally, defendant was not arrested before or during the flight. No United States official placed defendant under arrest before or during the flight. Neither did SA Secker nor SA Dockery tell the defendant he was under arrest. It was not until defendant exited the plane in Los Angeles did SA Randall Devine inform defendant he was under arrest.

Returning to the flight from the Philippines to the United States, defendant and the agents boarded the plane and sat in the rear of the plane. Tr., at p. 138. There was nothing separating the defendant and the agents from the rest of the passengers. Tr., at p. 142; (Doc. #80), at p. 6. Defendant was not handcuffed during the flight. Tr., at p.138; (Doc. #80), at p. 6. The agents did

3

not have weapons on them. Tr., at p. 139; (Doc. #80), at p. 6. Prior to flight takeoff, Defendant

used the bathroom. Gov. Ex. No. 9, at p. 1. Defendant was given two blankets. Gov. Ex. No. 9, at

p. 1. Defendant was tired and took a short nap after take-off. Tr., at p.142. At about 8:15 a.m.

(Central Time), defendant ate when food was served. Tr., at pp.142, 144. He slept and asked for

a blanket when he awoke. Tr. at p.143.

At about 9:30 a.m. SA Secker advised defendant of his *Miranda* rights with the assistance

of the "Advice of Rights" form. Tr., at p.144; Gov. Ex. 10; (Doc. #80) at p. 7. Defendant, a

former police officer, acknowledged by signing the form, that he understood his rights and was

willing to talk to the agents without a lawyer present. Tr., at pp. 145-46. The agents then

questioned defendant. Tr., at pp. 146-147. Defendant answered some questions and made

incriminating statements. (Doc. #80), at p. 8. Defendant was not threatened by the agents, nor

were any promises made to him. Tr. at p.147. At no time did the agents try to overbear

defendant's will or try to break him down. Tr. at pp.147, 156; (Doc. #80), at p. 8. During the

questioning, defendant did not invoke his rights, nor did he ever ask for an attorney to be present.

Tr. at p.147; (Doc. #80), at p. 6. His demeanor was cordial during the course of the interview and

he was mentally alert, even after taking a nap. Tr., at p.152. During the interview defendant was

lucid and able to talk logically. Tr., at p.156. Defendant asked for frequent breaks during the

interview and was given them, including snacks, bathroom breaks, and naps. Tr., at pp. 148-149.

There were some questions, however, that Defendant did not answer: whether or not he

had physical sexual contact with minor girls. Tr., at p.149. Later during the interview, however,

defendant volunteered the answers. Tr., at p.151. Defendant mentioned that electronics could be

in his luggage. Tr., at p.151. SA Secker asked defendant for permission to search his property,

and defendant declined. Tr., at p.164. Defendant was the one who brought up the computers

when being asked about photographing the victims. Tr., at pp.165-66. Defendant took another nap and woke up around 4:47 p.m. He was mentally alert. Tr., at p.152. Around 5:00 p.m., SA Secker again advised defendant of his *Miranda* rights. Tr., at p.152. Defendant signed another advice of rights form. Tr., at pp.152-53, Gov. Ex. 11. Defendant ate and was given the opportunity to use the restroom. Tr., at p.154.

The plane landed in Los Angeles and defendant and the agents were some of the first to leave the plane. SA Randall Devine and other officers met defendant at the gate. Tr., at pp.155, 107. SA Devine identified himself to defendant, advised him that he was in custody, and he was being placed under arrest at that time. Tr., at p. 110; (Doc. #80), at p. 9. Defendant was arrested on April 1, 2016, at 6:00 p.m. PDT (Doc. #12), at p. 2; *see also* https://www.timeanddate.com/time/zone/usa/los-angeles.  SA Devine told defendant that he was going to take him from the airport and he would be taken for an initial appearance. Tr., at p.108. SA Devine took custody of Defendant and Special Agents Secker and Dockery left. Tr., at p.110.

Defendant went through the immigration process and his luggage arrived at the airport carousel with the other passengers' luggage. Tr., at p.111. Defendant was lucid and coherent, never claimed that anyone mistreated him, and had no markings that reflected he had been injured in any way. Tr., at p. 120. He was clear, pleasant, and cooperative. Tr., at pp.120-21. After going through Customs, defendant repeatedly tried to talk to SA Devine about his case, in spite of SA Randall's request that Defendant not talk about his case. Tr., at p.119; (Doc. #80), at p. 9. Nevertheless, defendant told SA Devine that he really screwed up. Tr., at p.119.

## II.     LEGAL ANALYSIS

**1.  <u>The defendant was lawfully arrested by FBI Special Agent Randall Devine at the Los Angeles International Airport on April 1, 2016</u>**

Defendant claims that the FBI agents arrested him at the airport in Manila in violation of Fed. R. Crim. P. 4(c)(2). See (Doc. #103), at p. 2.

The 2011 amendment to Rule 4 was in effect at the time of defendant's arrest. Rule 4 provided:

**Rule 4. Arrest Warrant or Summons on a Complaint**

**(a) Issuance.** If the complaint or one or more affidavits filed with the complaint establish probable cause to believe that an offense has been committed and that the defendant committed it, the judge must issue an arrest warrant to an officer authorized to execute it. At the request of an attorney for the government, the judge must issue a summons, instead of a warrant, to a person authorized to serve it. A judge may issue more than one warrant or summons on the same complaint. If a defendant fails to appear in response to a summons, a judge may, and upon request of an attorney for the government must, issue a warrant.

**(b) Form.**
**(1) Warrant.** A warrant must:
(**A**) contain the defendant's name or, if it is unknown, a name or description by which the defendant can be identified with reasonable certainty;
(**B**) describe the offense charged in the complaint;
(**C**) command that the defendant be arrested and brought without unnecessary delay before a magistrate judge or, if none is reasonably available, before a state or local judicial officer; and
(**D**) be signed by a judge.
**. . . .**
**(c) Execution or Service, and Return.**
**(1) Whom.** Only a marshal or other authorized officer may execute a warrant. Any person authorized to serve a summons in a federal civil action may serve a summons.

> **(2) Location.** A warrant may be executed, or a summons served, within the jurisdiction of the United States or anywhere else a federal statute authorizes an arrest.[1]
>
> **(3) Manner.**
>
> > **(A)** A warrant is executed by arresting the defendant. Upon arrest, an officer possessing the original or a duplicate original warrant must show it to the defendant. If the officer does not possess the warrant, the officer must inform the defendant of the warrant's existence and of the offense charged and, at the defendant's request, must show the original or a duplicate original warrant to the defendant as soon as possible.
> >
> > **. . . .**
>
> **(4) Return.**
>
> > **(A)** After executing a warrant, the officer must return it to the judge before whom the defendant is brought in accordance with Rule 5. The officer may do so by reliable electronic means. At the request of an attorney for the government, an unexecuted warrant must be brought back to and canceled by a magistrate judge or, if none is reasonably available, by a state or local judicial officer.
> >
> > **. . . .**

In examining the rule, it is clear that the rule defines the process to be used in issuing, serving, and returning a warrant. At issue here is where an officer may execute an arrest warrant. According to the rule, an arrest warrant "may be executed or a summons served, within the jurisdiction of the United States or anywhere else a federal statute authorizes an arrest." Fed. R. Crim. P. 4(c)(2) (2011).

The agents complied with Rule 4(c)(2). Pursuant to an authorized arrest warrant signed by Gregory J. Linhares, Clerk, United States District Court for the Eastern District of Missouri, Special Agents of the Federal Bureau of Investigation, located and arrested Michael Bruce

---

[1] The current version of Rule 4(c)(2) provides: A warrant may be executed, or a summons served, within the jurisdiction of the United States or anywhere else a federal statute authorizes an arrest. A summons to an organization under Rule 4(c)(3)(D) may also be served at a place not within a judicial district of the United States.

McDonald upon exiting Philippines Airlines flight #112 at approximately 6:00 p.m. PDT, on April 1, 2016 at the Los Angeles International Airport. SA Devine located and arrested the defendant in the airport. (Doc. #80), at p. 9; Tr., at p. 110. The "Report Commencing Criminal Action," signed and filed in the United States District Court Central District of California on April 4, 2016 by FBI Special Agent Michael Hess, confirms the date and time of the defendant's arrest in this case. Gov. Ex. 12, (Doc. #2), at p. 2. SA Hess wrote that defendant was arrested on April 1, 2016, at 6:00 p.m. *See* Gov. Ex. 2 at p. 2. At that time, the defendant was at the Los Angeles airport.

SA Secker testified that neither he, nor any other federal agent placed defendant under arrest prior to defendant's arrest in the United States.

Thus, the Government fulfilled the requirements of Fed. R. Crim. P. 4(c)(2) by executing the arrest warrant for the defendant in this case. Therefore, this Court should deny Defendant's motion to suppress because Defendant was lawfully arrested.

2. **Defendant was not under arrest during the flight from Manila to the United States.**

Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way. *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990), citing *Miranda*, 384 U.S. at 444. While even the Supreme Court has observed that the task of defining custody is a slippery one, *United States v. Mottl*, 946 F.2d 1366, 1369 (8th Cir. 1991), courts distinguish formal arrest from custody when determining whether *Miranda* warnings are necessary. *See United States v. Ortiz*, 781 F.3d 221, 229 (5th Cir. 2015); *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004); *United States v. Boslau*, 632 F.3d 422, 427 (8th Cir. 2011); *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983) (finding that circumstances surrounding interrogation and a reasonable person test are essential

8

to the determination whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest).

Although the Government maintains that Defendant was not in custody during the flight from Manila to Los Angeles, this Court found to the contrary. O*rder, Report and Recommendation of Magistrate Judge*, (Doc. #80), at p. 32, District Court Order, (Doc. #91), at p. 12.

This Court should find that the defendant was not under arrest during the flight from Manila to Los Angeles. In the present case, the Magistrate Judge's Report and Recommendation found that Special Agents Dockery and Secker turned the defendant over to Agent Devine in the Los Angeles International Airport, who arrested the defendant on the indictment in this case. (Doc. #80), at p. 9. Further, while the defendant was escorted back to the United States by two FBI agents who sat with him on the airplane, he was not placed under arrest until he arrived in Los Angeles and did not wear handcuffs during the flight. (Doc. #80), at pp. 6, 9.

Defendant relies upon *Orozco v. Texas*, 394 U.S. 324 (1969), claiming that defendant was under arrest. *Orozco* is distinguishable to the case at hand. In *Orozco*, "[a]ccording to the officer's testimony, petitioner was under arrest and not free to leave when he was questioned in his bedroom in the early hours of morning." *Id*. at 327. Here, no agent arrested defendant nor told him he was under arrest until he arrived in the United States. Thus, *Orozco* is inapposite.

Nevertheless, assuming that he was arrested in Manila, defendant claims that his arrest was illegal and that his statements made afterwards should be suppressed based upon the holdings in *Taylor v. Alabama*, 457 U.S. 687 (1982) and *Brown v. Illinois*, 422 U.S. 590 (1975). In *Taylor*, the defendant was arrested without probable cause, was advised of *Miranda*, and confessed. The Court found that defendant's confession was the fruit of his illegal arrest and

9

should have been excluded. Likewise, in *Brown*, defendant was arrested without probable cause and without a warrant, was advised of *Miranda*, and made statements. The Court reversed that case noting, "The illegality [of the arrest] here, moreover, had a quality of purposefulness. . . . The manner in which Brown's arrest was affected gives the appearance of having been calculated to cause surprise, fright, and confusion." *Brown*, 422 U.S., at 605.

However, it does not follow that statements should be suppressed if the arrest, even though illegal, was based upon probable cause. In *New York v. Harris*, 495 U.S. 14 (1990), the Supreme Court addressed statements made after an illegal arrest. In *Harris*, there was probable cause to believe that defendant murdered a woman. As a result, officers went to Harris' apartment to take him into custody without an arrest warrant. Officers knocked on Harris' door and entered. Officers advised Harris of his *Miranda* rights and Harris confessed that he had murdered the woman. Harris was arrested, taken to the police department, re-advised of his *Miranda* rights, and wrote a statement confessing to the murder. *Id*. at 16.

The question presented to the Supreme Court was "whether Harris' second statement— the written statement made at the station house—should have been suppressed because the police, by entering Harris' home without a warrant and without his consent, violated *Payton v. New York*, 445 U.S. 573 (1980). . . , which held that the Fourth Amendment prohibits the police from effecting a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Id.* at 16.

The Court wrote:

This case is therefore different from *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). In each of those cases, evidence obtained from a criminal defendant following arrest was suppressed because the police lacked probable cause. The three cases stand for the familiar proposition that the indirect fruits of an illegal search or arrest should be

10

suppressed when they bear a sufficiently close relationship to the underlying illegality. *See also Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We have emphasized, however, that attenuation analysis is only appropriate where, as a threshold matter, courts determine that "the challenged evidence is in some sense the product of illegal governmental activity." *United States v. Crews*, 445 U.S. [463], at 471, 100 S.Ct. [1244], at 1250 [(1980)]. As Judge Titone, concurring in the judgment on the basis of New York State precedent, cogently argued below, "[i]n cases such as *Brown v. Illinois* (supra) and its progeny, an affirmative answer to that preliminary question may be assumed, since the 'illegality' is the absence of probable cause and the wrong consists of the police's having control of the defendant's person at the time he made the challenged statement. In these cases, the 'challenged evidence'—i.e., the post arrest confession—is unquestionably 'the product of [the] illegal governmental activity'—i.e., the wrongful detention." 72 N.Y.2d, at 625, 536 N.Y.S.2d, at 8, 532 N.E.2d, at 1235.

*Harris*, 495 U.S. at 18-19.

The Supreme Court concluded that Harris' statement was not the product of being in unlawful custody.

Here, assuming that defendant was arrested in the Philippines, just like in *Harris*, his subsequent statement was not the product of an illegal arrest. The arrest was not done for the purpose of causing surprise, fright, and confusion. Quite the opposite; the agents were concerned about his comfort on the plane. *See* Tr. at p. 142. When the defendant said he was cold, the agents got blankets for him. When the defendant said he was hungry, he was provided food. *Id.* When he needed to use the restroom, he was permitted to do so. When he wanted to sleep or take a break, he was permitted to do so.

Thus, even if the Court determines that his arrest was illegal, the Court should not suppress the statements defendant made during the flight. *See also* In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 177, 215 (2d Cir. 2008) (The inculpatory statements of defendants obtained overseas by U.S. agents were properly admitted at trial because the defendants received *Miranda* type warnings and the statements were voluntarily made).

## III.     CONCLUSION

For all of the foregoing reasons, including those in Government's previously filed

memoranda, the defendant's motion to suppress statements should be denied.

Respectfully submitted,

JEFFREY B. JENSEN
United States Attorney

*/s/ Robert F. Livergood*
ROBERT F. LIVERGOOD, 35432MO
Assistant United States Attorney
111 S. 10th Street, Rm. 20.333
St. Louis, Missouri 63102
(314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2018, the foregoing was filed electronically with the Clerk of
the Court to be served by operation of the Court's electronic filing system upon the following:

Mr. Robert C. Wolfrum
Assistant Federal Public Defender

*/s/ Robert F. Livergood*
ROBERT F. LIVERGOOD, 35432MO
Assistant United States Attorney